**CONTINENTAL CHEMISTE CORPO-RATION, Petitioner,**

v.

**William D. RUCKELSHAUS, Administrator, and Environmental Protection Agency, Respondents.**

No. 71–1828.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1972.

Decided May 11, 1972.

**332**

John M. Moelmann, D. Kendall Griffith, D. Patterson Gloor, Louis A. McLean, Northfield, Ill., for The Continental Chemiste Corp., petitioner; Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., of counsel.

Alan S. Rosenthal, Dept. of Justice, Thomas H. Kemp, Michael C. Farrar, Environmental Protection Agency, Washington, D. C., L. Patrick Gray, III, Asst. Atty. Gen., Washington, D. C., for respondents.

Before HASTINGS, Senior Circuit Judge, and KILEY and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

■ If use of an economic poison in compliance with the directions on its label will cause certain food to become "adulterated" within the meaning of the Food, Drug and Cosmetic Act (FDCA),[1] is the poison necessarily "misbranded" within the meaning of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)?[2] If not, the registrations of petitioner's products were improperly cancelled since, as a matter of fact, proper use of the products is not injurious to man. On the other hand, if the question is answered affirmatively, we must decide whether the failure to obtain a so-called "tolerance" for petitioner's products either as an added poisonous and deleterious substance,[3] or as a "food additive,"[4] means that even harmless traces of residue on foods result in *"per se adulteration"* under FDCA. In any event, we must give consideration to both FIFRA and FDCA to decide this case.

Petitioner manufactures three smoke insecticides containing a chemical known as "lindane."[5] Because lindane is an economic poison, the products have been registered with the Department of Agriculture since 1955.[6] Each of the three

1. 21 U.S.C. § 301 et seq. The portions of FDCA with which we are principally concerned are §§ 402(a) and 406(a) of the 1938 Act, 52 Stat. 1040, 1046, and 1049; the 1954 amendment relating to residues of pesticide chemicals in or on raw agricultural commodities, 68 Stat. 511; and the 1958 amendment "to prohibit the use in food of additives which have not been adequately tested to establish their safety." 72 Stat. 1784. See particularly 21 U.S.C. §§ 321(s), 342(a) (2), 346, 346a and 348.

2. 7 U.S.C. § 135(z). The statutory authorization for the administrative procedures which petitioner asks us to review are set forth in § 135b(c) and (d). Prior to December 2, 1970, the functions now performed by the Administrator of the Environmental Protection Agency pursu-

ant to that statute were performed by the Secretary of Agriculture. See Reorganization Plan No. 3 of 1970, 35 Fed.Reg. 15623, 84 Stat. . . . , 5 U.S.C. App. p. 609 (1970 ed.).

3. See 21 U.S.C. § 342(a) (2) (A) and §§ 346 and 346a.

4. See 21 U.S.C. §§ 321(s), 342(a) (2) (C) and 348.

5. Lindane is the accepted common name for the gamma isomer of benzene hexachloride and is known chemically as 1,2,3,4,5,6-hexachlorocyclohexane.

6. The products and their labels differ in various respects which are not material to the issues here. "Smo-Cloud" contains 10.2% lindane; "Bug-Tab" contains 20% lindane; and "Moth Cloud" contains 10.5% lindane.

products, when activated by a match, dispenses a cloud of poisonous particulate which kills bugs. The labels contain directions for proper use and advice to avoid prolonged breathing of the smoke, contact with skin and eyes, and ingestion, and to keep out of reach of children. The directions contemplate use of the product in the home, advising that pets and fish be removed, and: "Cover tightly or remove any food in rooms to be treated." [7]

The principal market for petitioner's products is for home use; its most significant hazards are the danger of inhalation and the risk that the smoke will penetrate coverings and leave residues on food.

In 1969 the Agricultural Research Division of the Department of Agriculture (ARS) concluded a series of studies of lindane products used in thermal vaporizers. Two general types of lindane vaporizers were being marketed, one which operated continuously and the other which volatized fixed quantities on a "one-shot" basis. The former, or continuous type, was approved for use in industrial establishments, but not for home use. Petitioner's products are of the latter type.[8] The studies indicated that continuous lindane vaporizers were in fact being used widely in homes, and that residues of lindane on food posed a threat to human health. Accordingly, ARS concluded that continued registration of lindane products intended for vaporizers was contrary to the requirements of FIFRA. Notices of cancellation were therefore sent to the entire industry in April, 1969.

At least four manufacturers, including petitioner, exercised their statutory right to have the matter referred to a scientific advisory committee. The committee concluded that "existing data are sufficient to indicate the reality of human hazard," [9] and recommended that "cancellation of registrations of all lindane products intended for vaporization should be maintained." [10] Acting on that recommendation, on October 5, 1970, the Administrator of ARS entered findings of fact and conclusions relating generally to the registration of lindane products for use in vaporizing devices. His order stated that the "notices of cancellation of registrations of the products involved in this proceeding are hereby affirmed."

Petitioner then filed a timely request for a public hearing to raise objections

7. A.49. The labels on Bug-Tab and Moth Cloud convey the same message in slightly different language.

8. Petitioner also contends its products produce "smoke" and not "vapor" and are therefore not lindane "vaporizers" of any sort.

9. A.19.

10. A.20. In its report the Committee noted:

"There are four areas which are clearly not open to argument. First, the closeness of the observed or calculated levels of lindane from vaporizing devices to the toxic threshold, is supported by many clinical examples; second, continued high dermal and respiratory levels persist in rooms fumigated with lindane devices; third, it is a certainty that crawling infants, the sedentary, and the bedridden will receive higher exposure than the literature would indicate, and

fourth, the attractiveness and availability to children of lindane for use in vaporizers is obvious." A.19.
Earlier in the report it had pointed out:
"Up to August 1953 there were 44 known human cases of lindane intoxication; of these, 31 were associated with either vaporizers or fumigators (R 14). From 1954 to 1969 the Department of Agriculture recorded 37 accidents involving lindane (E 18). In these there were seven deaths among children one and one-half to eight years old, of which six were known to be due to ingestion of lindane pellets (AE 7)." A.18.
If there was any evidence of misuse of petitioner's products, no significance was attached to such evidence by the Hearing Examiner or Judicial Officer. Thus, this case presents no issue relating to injury caused by misuse. Cf. Stearns Electric Paste Co. v. Environmental Protection Agency, 461 F.2d 293, pp. 304, 305 (7th Cir. 1972).

to the cancellation of its three registrations based, in part, on differences between its products and the other products which had been considered especially dangerous. In addition to the difference between infrequent "one-shot" applications and continuous use,[11] petitioner contends that the particles of its smokes are much larger than the particles of vapor produced by other lindane products and, therefore, much less apt to penetrate food coverings. It is undisputed, however, that some penetration of food coverings, other than metals and glass, does result from the use of petitioner's products.

Prior to the public hearing, the Secretary of Agriculture's responsibilities under FIFRA were transferred to the Administrator of the Environmental Protection Agency, the respondent herein. After a full evidentiary hearing, on September 20, 1971, the Examiner submitted findings and conclusions recommending that the cancellations be vacated. He found that petitioner had met its burden of proof and that its products "contain directions for use which are necessary and if complied with adequate for the protection of the public"; and that "when used as directed or in accordance with commonly recognized practice" the products are "not harmful to living man."[12] The Hearing Examiner's opinion is comprehensive and relates specifically to petitioner's products rather than to the industry in general.

Counsel for the Pesticides Office of respondent filed exceptions to the Hearing Examiner's recommended findings and order, stressing particularly the danger from inhalation of lindane and, secondarily, the danger from residues on food. The exceptions were reviewed by a judicial officer of the agency. It is the opinion of the Judicial Officer which raises the legal question stated at the beginning of this opinion.

The Judicial Officer agreed with the Hearing Examiner's findings and conclusions pertaining to the question of exposure by inhalation. With respect to the question of residues, however, he ruled as a matter of law that "any presence of lindane on processed or served food is *per se* contamination."[13] He did not disagree with the Examiner's finding that the amount of residue was not toxicologically significant, but held that since the Food and Drug Administrator had not established a tolerance for lindane residues on food for human consumption pursuant to § 406 or § 409 of the FDCA, 21 U.S.C. §§ 346 and 348, even a harmless trace results in "adulteration." He concluded that "all FIFRA labels should bear directions for use adequate to insure conformity to all pertinent regulations of other government agencies."[14] He therefore ordered that

11. In the consideration of the "continuous use" registrations, a particular point was made of the fact that although the product was not registered or labeled for home use, advertising and marketing techniques of those registrants actually were calculated to promote home use. In re Continental Chemiste Corp., et al., I.F. & R. Docket Nos. 5, 6, 7 and 10 (decision of Administrator of A.R.S. accepting recommendations of the Advisory Committee), Oct. 5, 1970, p. 7, finding 13 (A.39). No such problem was presented with respect to petitioner.

12. Among his specific findings were the following:

"11. Lindane is absorbed in the body; is not readily stored; and is excreted comparatively rapidly.
"12. The Food and Drug Administration has established tolerances for lindane on certain agricultural commodities.
"13. The World Health Organization has established an acceptable-daily-intake figure for ingested lindane.
"14. The language on the labels (including imprinting on bottles) of subject products has been approved by Pesticides Regulation Division.
"15. The labeled uses of subject products do not expose people or vertebrates to toxicologically significant amounts of lindane; and *do not create toxicologically significant residues in food tightly covered.*" A.54.

13. A.81.

14. "At the very least, all FIFRA labels should bear directions for use adequate to insure conformity to all pertinent regulations of other government agencies. It

petitioner's registrations be cancelled, subject to reinstatement if the labels were modified to prohibit use in areas where food is prepared, served or stored.

We stayed that order and must now determine its validity. There are three distinct theories which might support the order. Although respondent now relies on only the third, to discuss that theory intelligently it is necessary to understand why the first two are inapplicable. We shall therefore discuss the effect of (1) FIFRA apart from the requirements of FDCA; (2) the sections of the FDCA which relate to food which bears or contains any added poisonous or deleterious substance, 21 U.S. C. § 342(a) (2) (A) and § 346; and (3) the "food additive" amendments to FDCA enacted in 1958, 21 U.S.C. § 342 (a) (2) (C) and § 348.[15]

## I.

■ The subject matter of FIFRA[16] is economic poisons. The basic purpose of the statute was to regulate the labeling of such products to provide purchasers with assurance of effectiveness and safety when used in compliance with the manufacturer's instructions. Until the manufacturer persuades the Administrator (formerly the Secretary of Agriculture) that his proposed labeling is adequate and that use of the product in compliance with directions is safe, the product may not be registered; unregistered economic poisons may not be sold in interstate commerce.

■ Registrations must be renewed at five-year intervals. Because of the continuing potential for harm from the use of such poisons, the Administrator retains a continuing right to cancel (or if an emergency exists, immediately to suspend)[17] a registration. In cancellation proceedings, as in applications for initial registration, the manufacturer has the burden of proving that his product is not "misbranded" within the meaning of the Act. Stearns Electric Paste Company v. Environmental Protection Agency, 461 F.2d 293, pp. 304, 305 (7th Cir. 1972).

The statutory definition of the term "misbranded" incorporates a substantive standard of product safety. There are

would be odd, indeed, if the Environmental Protection Agency accepted as sufficient a label that permitted a product to be used in a way that is inconsistent with another requirement of Congress. The basic principle of statutory construction, that two related statutes should, whenever possible, be blended to reinforce their common purpose, applies with particular force to the interrelationship of the FIFRA labeling scheme and the Food, Drug and Cosmetic Act tolerance-setting provisions. See Environmental Defense Fund [Inc.] v. [United States Department of] HEW, *supra*, [138 U.S.App.D.C. 381, 428 F.2d 1083 (D.C.Cir. 1970)] n. 16. Happily, the FIFRA, far from being inconsistent with sections 406 and 409, complements them, and the labeling requirements can be harnessed to further their purposes.[19]" In his footnote 19, the Judicial Officer stated:

"While sections 406 and 409 appear to be chiefly concerned with chemicals used by manufacturers in processing food for human consumption, they are by their terms applicable to all *commercial* establishments. That these sections do not purport to regulate either home use or incidental contamination suggests only that these problems are not controlled easily by direct regulation. The FIFRA labeling scheme affords an opportunity to achieve the results which are generally sought by sections 406 and 409 but are beyond direct regulation.

"It might be that the silence of the Food and Drug Administration merely reflects an assumption that lindane is not used by commercial establishments and around consumable food, and were the FDA to focus on the problem, residues in the amounts deposited by Continental's products might be acceptable. In that event, it would be open to Continental to petition for an amendment to the label required by this opinion."

15. The Judicial Officer's references to §§ 406 and 409 correspond to §§ 346 and 348 of Title 21 of the U.S.Code.

16. 7 U.S.C. §§ 135–135k.

17. See Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1133 (7th Cir. 1970), reversed on procedural grounds on rehearing en banc, 435 F.2d 1151.

several tests which must be met. The directions accompanying the product, if complied with, must be "adequate for the protection of the public"; [18] warning statements, if complied with, must be "adequate to prevent injury to living man" [19] and other useful life. The substantive standards, phrased in terms of protection of the public and impact on living man, require consideration of the aggregate effect of a product's use upon the environment, including not only its potential for harm, but also the benefits which would be lost by removing it from the market.[20]

In this case, the tests of product safety as set forth in FIFRA's definition of "misbranded" were met by petitioner. The Hearing Examiner expressly found that petitioner had sustained its burden of proof. Although the Judicial Officer did not enter all of the Examiner's recommended findings, we are satisfied that they are supported by the record.[21] Since FIFRA itself does not condition entitlement to registration on compliance with any other statute, the language of FIFRA clearly supports the Hearing Examiner's conclusion that the order cancelling petitioner's registrations should be vacated.

The question is whether this conclusion can stand in the face of a claimed inconsistency with another requirement of Congress. To answer that question we must understand both the purpose of that other requirement and the precise language in which it has been defined by Congress. We must also keep in mind the fact that this is a case in which the registrant has satisfactorily demonstrated the safety of its product in an adversary proceeding. We stress this fact because the provisions of FDCA to be discussed were, in large part, intended to prohibit the marketing of products which had not been adequately tested to establish their safety.

## II.

The Judicial Officer's holding was predicated on both § 406 and § 409 of the FDCA, 21 U.S.C. § 346 and § 348. The reasons why the former section is inapplicable illuminate our analysis of the latter.

The FDCA prohibits the interstate shipment of adulterated food. The defi-

---

18. 7 U.S.C. § 135(z) (2) (c).

19. 7 U.S.C. § 135(z) (2) (d). See also 7 U.S.C. § 135(z) (2) (g).

20. See Stearns Electric Paste Company v. Environmental Protection Agency, 461 F. 2d 293, at pp. 307, 308 (7th Cir. 1972). See also Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 594 (D.C.Cir. 1971).

21. Thus, for example, we may take judicial notice of the existence of tolerances established by the Food and Drug Administration for residues of lindane on raw agricultural commodities (see Finding No. 12 quoted in footnote 12, *supra*, which was not entered by the Judicial Officer). The evidence indicates that the use of petitioner's products in the presence of *uncovered* food would be within those tolerances. Quite clearly, if the directions to remove or cover all food are complied with, the Examiner *correctly concluded* that the labeled use does not create toxicologically significant residues (see Finding No. 15 quoted in footnote 12, *supra*,

which also was not entered by the Judicial Officer). See 21 C.F.R. § 120.133. We mention this tolerance as only one of several items which support the Examiner's recommended findings; we do not mean to imply that compliance with the tolerance for lindane on raw agricultural commodities under FDCA is conclusive in the determination of safety under FIFRA. While it is persuasive evidence, the government could have come forward with evidence tending to show that the residues after use of petitioner's products were nevertheless dangerous. The Hearing Examiner concluded that the government had not overcome petitioner's *prima facie* case. The Judicial Officer did not enter Finding No. 12, but on his theory of the case, it was unnecessary, since admittedly there was some residue and the Judicial Officer considered any residue as *per se* fatal to petitioner's case. Nothing in the Judicial Officer's opinion indicates that he considered the residues toxicologically significant. Thus, if the Judicial Officer's legal theory is incorrect, it is evident that registrant has met its burden.

nition of the term "adulterated" has changed significantly over the years. In 1914 the Supreme Court held that flour was not adulterated simply because it contained a poisonous substance which had been added during processing. United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658. The Government was required to prove that the food itself, rather than the added substance, was dangerous. That test has survived insofar as inherent ingredients of food are concerned, but the 1938 statute revised the law applicable to food which "bears or contains any added poisonous or added deleterious substances." Such food is adulterated if the added poisonous substance is "unsafe within the meaning of § 406".[22] Thus, the 1938 Act modified the rule of *Lexington Mill* by focusing attention on the character of the added substance rather than the character of the food, and by shifting the burden of proving safety to the food processor.

Section 406 [23] provided that every poisonous or deleterious substance added to food was unsafe unless two conditions were met: First, that the poison is required in the production of the food, or at least its use could not be avoided by good manufacturing practice; and second, if that condition was satisfied, that the Secretary of Agriculture [24] had promulgated a regulation limiting the quantities of the substance which food may contain and such "tolerance" was not exceeded. Failure to satisfy either condition resulted in *per se* adulteration.

The Judicial Officer held that the use of petitioner's product would violate the second condition set forth in § 406 because no tolerance had been established for lindane residues on food for human consumption.[25] It is equally clear, how-

---

22. Section 402 provided in part:
"A food shall be deemed to be adulterated—
" . . . (2) If it bears or contains any added poisonous or added deleterious substance which is unsafe within the meaning of section 406; . . . " 52 Stat. 1046. See 21 U.S.C. § 342(a) (2) (A).

23. Section 406 is now codified as 21 U.S.C. § 346; it provides:
"Any poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice *shall be deemed to be unsafe for purposes of the application of clause (2)(A) of section 342(a)* [§ 402] *of this title*; but when such substance is so required or cannot be so avoided, the Secretary shall promulgate regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of public health, and any quantity exceeding the limits so fixed shall also be deemed to be unsafe for purposes of the application of clause (2)(A) of section 342(a) of this title. While such a regulation is in effect limiting the quantity of any such substance in the case of any food, such food shall not, by reason of bearing or containing any added amount of such substance, be considered to be adulterated within the meaning of clause

(1) of section 342(a) of this title. In determining the quantity of such added substance to be tolerated in or on different articles of food the Secretary shall take into account the extent to which the use of such substance is required or cannot be avoided in the production of each such article, and the other ways in which the consumer may be affected by the same or other poisonous or deleterious substances." (Emphasis has been added to the portion of the statute quoted in the text at footnote 31, *infra*.)

24. Now the Administrator of the Environmental Protection Agency. See Reorganization Plan, note 2, *supra*.

25. "Of even greater significance, however, is the fact that the Food and Drug Administration has not established a tolerance for lindane residues on food for human consumption, and thus any presence of lindane on processed or served food is *per se* contamination. See 21 U.S.C. 346, 348 (1968).[16] "
In his footnote 16, the Judicial Officer stated:
"While tolerances for residues of lindane on raw agricultural products have been set, counsel for the Agency points out, and Continental has not disagreed, that there are no such tolerances or exemptions for lindane established pur-

ever, that the first condition could not be satisfied; lindane is not required in the production of food [26] and there is no evidence that its use could not be avoided in good manufacturing practice, or even in good practice in a domestic kitchen. As respondent now acknowledges, it therefore appears that petitioner could never comply with § 406 even if a tolerance had been established.

The Judicial Officer's reliance on § 406, if correct, would permanently foreclose registration of petitioner's products. Reference to that section is predicated on the assumption (which is certainly not unreasonable) that those products are poisonous or deleterious substances within the meaning of § 402.[27] From that assumption, it inevitably follows that any use which leaves even a harmless trace of the product on food results in adulteration within the meaning of FDCA. The steps which lead to

this conclusion are: (1) the product is a poisonous substance; (2) § 402 provides that any food which "bears or contains" a poisonous substance is adulterated if it is "unsafe" within § 406; (3) this substance is unsafe within § 406 because, as the Judicial Officer noted, no tolerance has been established, and additionally, because it need not be used in food processing. Since, as the Judicial Officer reasoned, the labeled use of the product in an area where food is stored or served is "unsafe," the product is misbranded under FIFRA.

Respondent, we think correctly, disclaims reliance on § 406. When Congress enacted FIFRA in 1947, it adopted a concept of product safety analogous to the Supreme Court's pre-1938 interpretation of the food law in *Lexington Mill.*[28] If it had adopted the *per se* approach of § 406, all domestic use of pesticides in kitchen areas would have been prohibited [29] and only by an extralegal sys-

---

suant to section 406 (21 U.S.C. 346) and 409 (21 U.S.C. 348) of the Federal Food, Drug and Cosmetic Act (21 U.S. C. 346a) concerning poisonous ingredients in food for human consumption. Section 406 reads: 'Any poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice shall be deemed to be unsafe.' The section further provides that residues of such poison, where required or unavoidable, shall be within tolerance limits established by regulation. Section 409 reads that 'A food additive shall, with respect to any particular use or intended use of such additives, be deemed to be unsafe,' unless its use conforms to the terms of an exemption or its use is prescribed by regulation. Since sections 406 and 409 'affect food that might be found in a home or restaurant' (Respondent's Exceptions to Examiner's Opinion at 4), contamination of food by lindane would seem to result in violation of the Act, since no tolerances exist. For a discussion of the tolerance-setting provisions of the Act, see Environmental Defense Fund [Inc.] v. [United States Dept. of HEW, 428 F.2d 1083 (D.C. Cir. 1970); United States v. Bodine Produce Co., 206 F.Supp. 201 (D.C. Wis. [Ariz.] 1962)."

26. At least no such evidence was offered in this case. Theoretically, if insects were so numerous as to interfere with production and if there were no other insecticide, then it might be argued that lindane was required.

27. It seems perfectly clear that the products would have been so classified prior to the enactment of the food additive amendment in 1958. Subsequent to 1958, if a product is a "food additive," it is excluded from the "poisonous" or "deleterious" category. See 21 U.S.C. § 342(a) (2) (A). Petitioner persuasively argues that its product does not fit within the statutory definition of a "food additive." See 21 U.S.C. § 321(s). Under our analysis, we need not pass on the validity of this argument. In this part of our opinion we explain why § 406 is inapplicable if the product is in the "poisonous" classification (which it *must* have been during the pre-1958 period and *may* have been since 1958); in Part III we explain why § 409 is inapplicable if the product is a "food additive."

28. 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658.

29. Cf. Flemming v. Florida Citrus Exchange, 358 U.S. 153, 160–165, 79 S.Ct. 160, 3 L.Ed.2d 188.

tem of informal tolerances could the continued use of such products have been permitted.[30] No such consequences follow, however, if we read the words used by Congress in § 406 exactly as they were written. Under that reading harmless traces of lindane residue are merely "deemed to be unsafe for purposes of the application of clause (2) (A) of § [402] of this title," rather than unsafe for the purpose of other federal legislation as well.[31]

As we read § 406, therefore, the reason it does not permanently foreclose registration of petitioner's products is that its definition of product safety is only for the purposes of FDCA and is not incorporated in FIFRA.

### III.

If, as respondent contends, petitioner's products are "food additives" rather than added poisonous or deleterious substances, § 409 leads us to an "unsafe" conclusion by a path which is parallel to that indicated by § 406.

A food is deemed to be adulterated if it bears or contains any "food additive" which is "unsafe" within the meaning of § 409.[32] That section provides that any use of a food additive is unsafe unless the Administrator has either granted an exemption covering the additive or else its use is within the limits of a tolerance which he has established. Again, however, the use of an additive not covered by an exemption or by a tolerance is merely "deemed to be unsafe for purposes of the application of clause (2) (C) of § [402] of this title." Thus, just as an exact reading of the language of § 406 avoids the Judicial Officer's construction of that provision, a parallel reading of the comparable words in § 409 will also defeat respondent's "food additive" argument. In this case we believe this literal reading is supported by a fair evaluation of the history and purposes of the food additive amendment of 1958.

We first note that there is no suggestion in the history of the 1958 legisla-

---

30. In explaining the need for the 1954 legislation relating to the use of pesticides on raw agricultural commodities, the Senate Committee on Labor and Public Welfare stated:

"Regulations limiting the amount of pesticide residue which may remain in or on food have been issued under the present law in only one instance, although the law authorizing such regulations has been in effect for over 15 years. During all that time control has been exercised through unofficial and informal tolerances." S.Rep. 1635 (83rd Cong. 2d Sess.), 1954 U.S.Code Cong. & Admin.News, pp. 2626, 2627.

The extralegal system of informal tolerances which temporarily forestalled the total elimination of swordfish from the domestic market because of mercury contamination has been criticized. Comment, Health Regulation of Naturally Hazardous Foods: The FDA Ban on Swordfish, 85 Harv.L.Rev. 1025, 1034 (1972). Referring to § 406, 21 U.S.C. § 346, the commentator stated:

"Ironically, under the Government's own theory that the mercury in swordfish is an added substance, this section may have been bypassed illegally by the

FDA in setting its 0.5 ppm guideline informally." *Ibid.*

31. Section 406 is quoted in full in footnote 23, *supra.*

32. The relevant part of § 402 (21 U.S.C. § 342) provides that a food shall be deemed to be adulterated ". . . (C) if it is, or if it bears or contains, any food additive which is unsafe within the meaning of section 348 [§ 409] of this title: . . . ."

Section 409 (21 U.S.C. § 348) provides, in part:

"A food additive shall, with respect to any particular use or intended use of such additives, *be deemed to be unsafe for the purposes of the application of clause (2) (C) of section 342(a)* [§ 402] *of this title,* unless—

"(1) it and its use or intended use conform to the terms of an exemption which is in effect pursuant to subsection (i) of this section; or

"(2) there is in effect, and it and its use or intended use are in conformity with, a regulation issued under this section prescribing the conditions under which such additive may be safely used. . . ." (Emphasis added.)

tion that it was intended to affect the administration of any other statute. Unlike the 1954 amendment which expressly took into account the interests of both the pesticide industry and the food industry in coordinating the regulation of the use of pesticide chemicals on raw agricultural commodities under both FDCA and FIFRA, the Senate Committee Report on the 1958 Act purports only to deal with the food processing industry.[33] This report identifies two broad purposes to be accomplished by the food additive legislation.

First, Congress intended to establish a procedure for premarketing clearance of untested food additives.[34] As the title of the statute plainly stated, its purpose was "to prohibit the use in food of additives which have not been adequately tested to establish their safety." 72 Stat. 1784. Prior to such testing and the adoption of either an exemption or permitted tolerance limitations, new additives were to be banned by a statutory concept of *per se* adulteration.

Second, in evaluating the safety of new additives, the agency was to avoid the *per se* approach required by the existing statutory references to poisonous and deleterious substances. The test of safety was intended to take into account the broader concepts of safety under the intended conditions of use; [35] the benefits of the additive were to be evaluated rather than merely its potential for harm.[36]

33. Compare S.Rep. 1635, *supra*, note 30, *id.* at pp. 2626–2636, with S.Rep. 2422 (85th Cong.2d Sess.), 1958 U.S.Code Cong. & Admin.News, pp. 5300–5311.

34. "Nonetheless, existing law permits any processor who chooses to pay no heed either to the public's health or to his continuance in one particular line of business to unfairly compete with responsible processors, to defy the Food and Drug Administration and to endanger the health of millions by using an untested additive for as long a time as it may take for the Government to suspect the deleteriousness of his additives, schedule research into its properties and effects, and, finally—perhaps years later—to begin the years-long experiments needed to prove the particular additive safe or unsafe. This huge loophole is 1 of 2 flaws in existing law which, through this measure, we are attempting to fill. This bill, if enacted, will require the processor who wants to add a new and unproven additive to accept the responsibility now voluntarily borne by all responsible food processors of first proving it to be safe for ingestion by human beings." S.Rep. 2422 (85th Cong.2d Sess.), 1958 U.S.Code Cong. & Admin.News, pp. 5300, 5301.

35. "The second flaw in existing law which has proved detrimental to consumers, to processors, and to our national economy and which this bill seeks to remove is a provision which has inadvertently served to unnecessarily proscribe the use of additives that could enable the housewife to safely keep food longer, the processor to make it more tasteful and appetizing, and the Nation to make use of advances in technology calculated to increase and improve our food supplies. Your committee agrees with the Food and Drug Administration that existing law should be changed to permit the use of such additives as our technological scientists may produce and which may benefit our people and our economy when the proposed usages of such additives are in amounts accepted by the Food and Drug Administration as safe. The rulings of the Department of Health, Education, and Welfare on such questions are, of course, subject to judicial review. The concept of safety used throughout this bill centers on the question of whether a substance is safe for use with reference to the health of man or animal." Ibid.

36. "It would make possible the use of additives discovered by our scientists which, having been adjudged safe for humans and animals when used in or within certain quantitative limits, could materially advance our ability to make more wholesome foods available to more people at all seasons and, perhaps, we hope, to assure to ourselves and others the ability to stockpile supplies of healthful and appetizing foods over such long periods of time as emergencies might make either desirable or essential." *Id.* at p. 5302.

In short, in making its ultimate determination whether new additives, or food containing them, may be marketed, F.D.A. employs the kind of substantive standard of product safety embodied in FIFRA's "injury to man" concept, rather than a narrow consideration of the character of the additive itself.

■ Thus, the concept of *per se* adulteration was designed to serve the procedural purpose of keeping products off the market until after their safety has been tested and to place the burden of demonstrating safety on industry rather than government. The registration requirements of FIFRA are designed to accomplish precisely the same objectives. Although the statutory procedures are somewhat different, both FDCA and FIFRA require premarketing clearance of new or untested products, both place the burden of proof on industry, and neither employs an automatic *"per se"* approach to the application of the substantive standard of product safety.[37]

Neither of the broad purposes of the food additives legislation will be defeated by accepting the Hearing Examiner's findings as controlling in this case. Those findings are not in conflict with either the letter or the spirit of FDCA or FIFRA.

Rejection of the Judicial Officer's reliance on a *per se* approach of the review stage of this proceeding need not foreclose a coordinated interpretation of the two statutes in a proper procedural context. Subsequent to the hearing below, the authority to determine tolerances for pesticides formerly exercised by the Secretary of Agriculture was transferred to respondent.[38] Nothing in either FDCA or FIFRA, or in our holding today, will prevent the Administrator from determining tolerance limits in the same proceeding in which the right to registration is adjudicated if the issues are properly framed before the hearing commences.[39] We merely hold that since petitioner met its burden of proof in a full evidentiary hearing, its registrations may not be cancelled by adopting a construction of FIFRA and FDCA which is not

37. Indeed, it is of interest that the standard of review under FIFRA is narrower than that applicable to review of a denial of a tolerance under § 409 (21 U.S.C. § 348). FIFRA, as well as the tolerance procedure applicable to raw agricultural commodities (21 U.S.C. § 346a), requires that the findings of the Administrator be sustained "if supported by substantial evidence when considered on the record as a whole," whereas § 409 requires that such findings be sustained only if "based upon a fair evaluation of the entire record." Congress deliberately selected a broader standard for review of food additive tolerances to focus on the fairness of the evaluation so that the "[p]ersonal attitudes or preferences of administrative officials could not prevail on the basis of being supported by substantial evidence picked from the record without regard to other evidence of probative value in the record." Rep. Williams quoted in S.Rep. 2422 (85th Cong.2d Sess.), 1958 U.S. Code Cong. & Admin.News, pp. 5300, 5308.

38. See Reorganization Plan, note 2, *supra*.

39. Consolidation of FDCA tolerance issues and FIFRA registration issues in the same proceeding may be extremely desirable because the same evidence may relate to the issues under both statutes. The fact that more parties may have a right to participate in a tolerance proceeding (which is more legislative in character) than in a particular cancellation hearing, the fact that FIFRA provides for participation by a scientific advisory committee whereas §§ 406 and 409 of FDCA do not, and the fact that there are differences in the standard of review under the two Acts (see footnote 37, *supra*), all point to the need for careful attention to procedural problems before such consolidation is required. *Cf.* 21 U.S.C. § 346a (d) and (e). The difference in the statutory standard of review demonstrates, we believe, that Congress has not mandated such a consolidation.

required by the language or purpose of either statute.[40]

The orders of cancellation must therefore be set aside.[41]

40. Respondent has provided us with an unreported opinion which, inter alia, notes that respondent's construction of the food additive legislation may lead to the conclusion that all fish in the Great Lakes are adulterated and therefore subject to seizure (or at least will be as soon as they are cooked), assuming that they contained traces of DDT. United States v. City Smoked Fish Co. (E.D.Mich., May 25, 1970, Civil Nos. 33989 and 33669). A moment's reflection on the scope of power which the *"per se"* adulteration approach confers on an administrative agency will help explain our unwillingness to extend this approach beyond the clear mandate of Congress. A requirement that a tolerance covering every labeled use of any economic poison precede its registration maybe appropriate, but also, if strictly enforced, might burden respondent with more responsibility than it could effec-

tively and promptly discharge. *Cf.* Toilet Goods Association, Inc. v. Finch, 419 F.2d 21, 28 (2d Cir. 1969). In any event, a requirement with such far-reaching implications should not be adopted as a tactic to determine a particular controversy at the review stage of an administrative proceeding.

For the purpose of this case, we have assumed, without deciding, that food in a domestic kitchen is "adulterated" by harmless traces of lindane (whether it be an added poisonous substance or a food additive). FDCA was, of course, primarily intended to regulate the food processing industry rather than cooking practices in the home. *Cf.* Judicial Officer's footnote 19, quoted in footnote 14, *supra.*

41. Our disposition of the case makes it unnecessary for us to consider several procedural due process arguments advanced by petitioner.