Minas H. PAPAS, Ollie M. Papas, his wife, Plaintiffs–Appellants,

v.

The UPJOHN COMPANY, a Delaware corporation qualified to do business in the State of Florida, Zoecon Corporation, a Delaware corporation currently doing business in the State of Florida, Defendants–Appellees.

No. 89–3752.

United States Court of Appeals, Eleventh Circuit.

Feb. 28, 1991.

Lee S. Haramis, and Dana G. Bradford, II, Baumer, Bradford & Walters, P.A., Jacksonville, Fla., for plaintiffs-appellants.

Angela J. Nicita, Chambers, Steiner, Mazur, Ornstein & Amlin, P.C., Detroit, Mich. and Arthur H. Bryant, Washington, D.C., for amicus State of Fla.

Lawrence S. Ebner, McKenna & Cuneo, Washington, D.C., Frank W. Hession and Robert B. Guild, Matthews & Hession, Jacksonville, Fla., for Zoecon Corp.

Michael I. Coulson, Howell, Liles, Braddock & Milton, Jacksonville, Fla., for Upjohn Corp.

John J. Weinholtz, Peter D. Braun and Paul F. Jones, Buffalo, N.Y., for Reichhold.

Joshua Kardisch, Rivkin Radler Dunne & Bayh, Uniondale, N.Y. and Peter Jennings, Midland, Mich., for Dow Chemical.

Before ANDERSON and EDMONDSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

PER CURIAM:

Minas and Ollie Papas ("Papas") filed a diversity action in federal district court against the Upjohn Company and Zoecon Corporation. The complaint alleged that Minas, while working for a humane society, had applied certain pesticides manufactured by Upjohn and Zoecon to dogs to rid the dogs of fleas, ticks, and other pests. The complaint also alleged that these chemical products caused him to suffer health problems. The complaint sounded in negligence, strict liability, and breach of implied warranty of merchantability, and included a derivative claim for loss of consortium. The three main counts were, in whole or in part, claims of inadequate labeling in the light of alleged dangers arising from exposure to the pesticides.

Zoecon moved for partial summary judgment on the labeling claims. It argued that the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C.A. §§ 136–136y ("FIFRA"), under which its product is reg-

istered, preempted such claims. The district court agreed and granted Zoecon's motion. Having determined that this issue involves a controlling question of law on which there are substantial grounds for difference of opinion [1] and that an immediate appeal would materially advance the ultimate determination of the litigation, the district court certified the matter for interlocutory appeal, pursuant to 28 U.S.C.A. § 1292(b). We granted the petition to appeal, and the appeal followed. We conclude that state common law tort claims for inadequate labeling are impliedly preempted by FIFRA and, accordingly, affirm the district court's grant of partial summary judgment.

## I. THE DOCTRINE OF FEDERAL PREEMPTION

Federal preemption of state law is based on the supremacy clause of the Constitution:

This Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Art. VI, cl. 2. Preemption can be either express or implied; it "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)).

Preemption can be inferred

(1) "when there is outright or actual conflict between federal and state law;"

(2) "where compliance with both federal and state law is in effect physically impossible;"

(3) "where there is implicit in federal law a barrier to state regulation;"

(4) "where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law;" or

(5) "where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress."

*Louisiana Public Service Comm'n v. F.C.C.,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986) (citations omitted); *see also International Paper Co. v. Ouellette,* 479 U.S. 481, 491–92, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987); *Hillsborough County, Fla. v. Automated Med. Labs.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *De La Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022; *Taylor v. General Motors Corp.,* 875 F.2d 816, 822, 825–26 (11th Cir.1989); *Stephen v. American Brands, Inc.,* 825 F.2d 312, 313 (11th Cir.1987). A state law—even if it has the same ultimate goal as a federal law—may stand as an obstacle to the full implementation of a federal law and therefore be preempted "if it interferes with the methods by which the federal statute was de-

---

1. Only one federal appellate court has considered the issue: in *Ferebee v. Chevron Chemical Company,* 736 F.2d 1529 (D.C.Cir.1984), the court concluded that FIFRA did not preempt state common law tort suits based on inadequate labeling. District courts are split on the issue. Cases finding preemption include *Hurt v. Dow Chem. Co.,* 759 F.Supp 556 (E.D.Mo.1990); *Kennan v. Dow Chem. Co.,* 717 F.Supp. 799 (M.D.Fla.1989); *Fisher v. Chevron Chem Co.,* 716 F.Supp. 1283 (W.D.Mo.1989); *Herr v. Carolina Log Bldgs., Inc.,* No. EV 85–262–C (S.D.Ind. Sept. 22, 1989); *Watson v. Orkin Exterminating Co.,* No. JFM–88–2427 (D.Md. Nov. 8, 1988); and *Fitzgerald v. Mallinckrodt, Inc.,* 681 F.Supp.

404 (E.D.Mich.1987). Cases in which district courts found no preemption include *Arkansas Platte & Gulf Partnership v. Van Waters & Rogers, Inc.,* 748 F.Supp. 1474 (D.Colo.1990); *Evenson v. Osmose Wood Preserving, Inc. & American Wood Preservers Inst.,* 760 F.Supp. 1345 (S.D.Ind.1990); *Stewart v. Ortho Consumer Products,* 1990 WL 36129 (E.D.La.1990); *Cox v. Velsicol Chem. Corp.,* 704 F.Supp. 85 (E.D.Pa. 1989); *Whitener v. Reilly Indus., Inc.,* No. 87–5224 (S.D.Ill.1989); *Roberts v. Dow Chem. Co.,* 702 F.Supp. 195 (N.D.Ill.1988); and *Wilson v. Chevron Chem. Co.,* 1986 WL 14925 (S.D.N.Y. 1986).

signed to reach this goal." *Ouellette*, 479 U.S. at 494, 107 S.Ct. at 813.

■ The principle of implied preemption "applies whether the federal law is embodied in a statute or regulation, and whether the state law is rooted in a statute, regulation, or common law rule." *Taylor*, 875 F.2d at 826 (citations omitted). *Accord Ouellette*, 479 U.S. at 494–95, 499 n. 20, 107 S.Ct. at 813, 815 n. 20 (state nuisance suits preempted by Clean Water Act); *Louisiana Public Service Comm'n*, 476 U.S. at 369, 106 S.Ct. at 1898–99 (federal agency action may preempt state regulation); *Automated Med. Labs.*, 471 U.S. at 713, 105 S.Ct. at 2375 (federal regulations can preempt state law); *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181, 187 (3d Cir.1986) (state common law damage actions can have effect of imposing requirements which create obstacle to accomplishment of "full purposes and objectives of Congress") (decision and reasoning adopted by Eleventh Circuit in *Stephen v. American Brands, Inc.*, 825 F.2d at 313). Thus, we have recognized that the "imposition of damages under state tort law has long been held to be a form of state regulation subject to the supremacy clause." *Taylor*, 875 F.2d at 824 n. 16 (citing *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)).

■ The critical question in considering whether state law is preempted by federal law is Congressional intent—that is, "whether Congress intended that federal regulation supersede state law." *Louisiana Public Service Comm'n*, 476 U.S. at 369, 106 S.Ct. at 1899. "[I]n implied preemption analysis it is possible to infer preemptive intent solely from effects": even if statutory language or legislative history is unclear, federal law preempts state law if "the ordinary application of the two laws creates a conflict." *Taylor*, 875 F.2d at 826.

## II. THE FIFRA SCHEME OF PESTICIDE REGULATION AND LABELING

FIFRA, initially enacted in 1947, was completely revised in 1972, when the responsibility for its enforcement was transferred to the Environmental Protection Agency ("EPA") from the Department of Agriculture. The Senate Committee on Agriculture and Forestry, to which the bill was referred, identified two purposes of the 1972 revisions to FIFRA: to "(A) regulate the use of pesticides to protect man and his environment; and (B) extend Federal pesticide regulation to actions entirely within a single State." S.Rep. No. 92–838, 92d Cong. 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin.News 3993. At that time, FIFRA was amended to define "protect health and the environment" and "protection of health and the environment" as "protection against any unreasonable adverse effects on the environment." 7 U.S.C.A. § 136(x). "Unreasonable adverse effects on the environment" was, in turn, defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C.A. § 136(bb).

FIFRA's legislative history indicates that Congress intended to establish a comprehensive regulatory scheme in which the EPA Administrator would be responsible for determining whether to register a pesticide and, if so, under what circumstances. Congress recognized that the control of pesticides required a careful balancing of benefit against risk:

> While appropriate pesticides properly used are essential to man and his environment, many constitute poisons that are too dangerous to be used for any purpose. Others are dangerous unless used extremely carefully.... Pesticides therefore have important environmental effects, both beneficial and deleterious. Their wise control based on a careful balancing of benefit versus risk to determine what is best for man is essential.

S.Rep. No. 92–838, 92d Cong. 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News at 3996. The EPA Administrator was designated as the entity to conduct the balancing analysis:

The question [the Administrator] must decide is "Is it better for man and the environment to register this pesticide, or is it better that this pesticide be banned?" He must consider hazards to farmworkers, hazards to birds and animals and children yet unborn. He must consider the need for food and clothing and forest products, forest and grassland cover to keep the rain when it falls, prevent floods, provide clear water. He must consider aesthetic values, the beauty and inspiration of nature, the comfort and health of man. All these factors he must consider, giving each its due. No one should be given undue consideration, no one should be singled out for special mention, no one should be considered a "vital" criterion.

For each pesticide the Administrator must ask the same question.... In each case the Administrator must take into account all relevant factors and decide whether it is better for man and the environment that this product be registered.

*Id.* at 4032–33. Under FIFRA, the Administrator is required to register a pesticide if he determines that, when considered with any restrictions imposed on it, the pesticide warrants the proposed claims made for it; its labeling and other materials comply with FIFRA requirements; it will perform its intended purpose without unreasonable adverse effects on the environment; and when used in accordance with common practice, it will not generally cause unreasonable adverse effects on the environment. *See* 7 U.S.C.A. § 136a(c)(5).

In this comprehensive regulatory scheme for pesticides, Congress delineated the extent to which the states could regulate pesticides in section 136v:

§ 136v. Authority of States

(a) In General

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

(c) Additional Uses

(1) A State may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs in accord with the purposes of this subchapter and if registration for such use has not previously been denied, disapproved, or canceled by the Administrator....

7 U.S.C.A. § 136v (West 1980 & Supp.1990) (subsection headings added by 1988 amendment).

The statute's language, by itself, is a powerful limit on state power over labeling. A report accompanying the bill, as originally reported out of the House Committee, also indicated the limits on state power due to the division of authority between the federal and state governments: "In dividing the responsibility between the States and the Federal Government for the management of an effective pesticide program, the Committee had adopted language which is intended to completely preempt State authority in regard to labeling and packaging." H.R.Rep. 92–511, 92d Cong. 1st Sess. 16 (1971). Congress recognized that, while the intent of this provision was "to leave to the States the authority to impose stricter regulation on pesticides *use* than that required under the Act," subsection (b) preempted "any State labeling or packaging requirements differing from such requirements under the Act." S.Rep. 92–838, 92d Cong.2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News at 4021 (emphasis supplied); *see also* S.Rep. 92–970, 92d Cong.2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 4092, 4128.

FIFRA directs that States "shall not impose or continue in effect any requirements for labeling or packaging" beyond the requirements imposed by FIFRA. Given FIFRA's words and its legislative history, FIFRA may expressly preempt state com-

mon law actions of the kind before us, just as FIFRA preempts other legal requirements in the form of state statutes and regulations. But, mindful that "Congress has long demonstrated an aptitude for expressly barring common law actions when it so desires," *Taylor*, 875 F.2d at 824, we admit to a little uncertainty and pass over the question of express preemption. Instead, we will decide whether federal preemption of state common law tort claims based on labeling deficiencies can be inferred from FIFRA and the labeling regulations promulgated under it.

### III. STATE COMMON LAW TORT LABELING CLAIMS IMPLIEDLY PREEMPTED BY FIFRA

Under FIFRA, the federal government—through the EPA—has the sole and exclusive right to regulate pesticide labels. While states can regulate the sale or use of federally registered pesticides, no state can "impose or continue in effect any requirements for labeling or packaging [of pesticides] in addition to or different from" those required by FIFRA. 7 U.S.C.A. § 136v(b).

In 40 C.F.R. Part 156, the EPA has regulated almost every aspect of pesticide labeling. The EPA specifically regulates the manner in which warnings and precautionary statements for the pesticides are to be presented and provides specific requirements about the content, placement, type size, and prominence of the warnings and precautionary statements. *See* 40 C.F.R.

§ 156.10(h) (1990). These warnings and precautionary statements concern the toxicological hazards of the pesticide, including "hazard to children, environmental hazard, and physical and chemical hazard." *Id.* The EPA also requires that a statement of practical treatment (that is, first aid or other treatment) for each pesticide appear on the label. 40 C.F.R. § 156.10(h)(1)(iii). Additional warnings and precautionary statements about risks to humans are required under the heading "Precautionary Statements" and the subheading "Hazard to Humans and Domestic Animals."[2] Typical precautionary statements are prescribed which "must be modified or expanded to reflect specific hazards." *See* 40 C.F.R. § 156.10(h)(2)(i)(B) and table.[3] In addition, the EPA requires that pesticide labels must contain directions for use stated in terms "which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide." 40 C.F.R. § 156.10(i)(1)(i). These directions, when followed, "must be adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment." *Id.*[4] It is in the light of these comprehensive regulations that the EPA approves a specific label for each pesticide.

We conclude that FIFRA impliedly preempts state common law tort actions based on labeling claims in several ways. First, having considered FIFRA's express prohibition of state labeling requirements in addition to those required under FIFRA,

---

**2.** The EPA requires that if a hazard exists to humans or domestic animals, these precautionary statements must indicate (1) "the particular hazard," (2) "the route(s) of exposure," and (3) "the precautions to be taken to avoid accident, injury or damage." 40 C.F.R. § 156.10(h)(2)(i)(A). The precautionary statements indicate whether protective equipment or garments are necessary when applying the pesticide.

**3.** A pesticide is considered misbranded if "the label does not contain a warning or caution statement which may be necessary" and which, if complied with, "is adequate to protect health and the environment." 7 U.S.C.A. § 136(q)(1)(G). A manufacturer is subject to penalties under FIFRA if its pesticide is misbranded.

**4.** In addition, a pesticide is considered misbranded—and a manufacturer subject to various penalties, including registration revocation—if the labeling "does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with ... are adequate to protect health and the environment." 7 U.S.C.A. § 136(q)(1)(F). "The basic purpose of the statute [is] to regulate the labelling of such products to provide purchasers with assurance of effectiveness and safety when used in compliance with the manufacturer's instructions." *Roberts v. Dow Chemical Co.*, 702 F.Supp. 195, 196 (N.D. Ill.1988) (quoting *Continental Chemiste Corp. v. Ruckelshaus*, 461 F.2d 331, 335 (7th Cir.1972)).

7 U.S.C.A. § 136v(b), and having examined the labeling regulations adopted pursuant to FIFRA, see *supra,* we hold that the federal government has occupied the entire field of labeling regulation, leaving no room for the states to supplement federal law, even by means of state common law tort actions.

We also hold that jury awards of damages in such tort actions would result in direct conflict with federal law. For EPA-registered pesticides, the warning and use statements present on the labels indicate that the EPA has determined that those statements are adequate to protect man and the environment: that the pesticide as labeled does not pose "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *See* 7 U.S.C.A. §§ 136(q)(1)(F), 136(q)(1)(G), 136(bb); 40 C.F.R. §§ 156.-10(h), 156.10(i). Thus, a jury determination, via a state common tort judgment, that a pesticide's labeling is inadequate results in a direct conflict with the EPA's determination that the labeling is adequate to protect against health risks. Such a jury determination is also in direct conflict with the Congressional intent that *the EPA*

*Administrator* determine the reasonableness of the risks to man and the environment posed by pesticides, at least with respect to the labeling of pesticides.[5]

In addition, allowing state common law tort suits for inadequate labeling would "stand as an obstacle to the accomplishment and execution of the full objectives of Congress." One of the EPA's objectives in its labeling regulations is the uniformity of labeling across the nation and among (1) different brands of the same pesticide, (2) different pesticides performing the same function, and (3) different pesticides posing the same or similar risks to health and the environment. *See* 40 C.F.R. Part 156.[6] This objective of achieving uniformity in labeling was endorsed by Congress: in 1988, without changing the language of § 136v(b) which prohibits state regulation of pesticide labeling and packaging, Congress added the heading "Uniformity" to this section. A jury determination that a label was inadequate would require that the manufacturer change the label or risk additional suits for damages. Such a change, if permitted by the EPA, would destroy the uniformity that Congress and the EPA seeks to achieve in pesticide labeling because the warning label for that pes-

---

**5.** The states are specifically permitted to make such determinations with respect to the "sale or use" of pesticides, as long as they do not permit any sale or use prohibited by the federal government under FIFRA. *See* 7 U.S.C.A. § 136v(a).

*New York State Pesticide Coalition, Inc. v. Jorling,* 874 F.2d 115 (2d Cir.1989), is instructive about the respective authority of the state and federal governments to regulate pesticides under FIFRA. In *Jorling,* the Second Circuit upheld certain state notification requirements placed on commercial pesticide applicators. It noted that "[t]he states have joint control with the federal government in regulating the use of pesticides, for the safety of its citizens and the environment ... with the exception of the EPA's exclusive supervision of labeling." 874 F.2d at 118 (citation omitted). It drew a distinction between FIFRA labeling which "is designed to be read and followed by the end user," and notification requirements—regulation on pesticide use—placed on particular end users (professional pesticide applicators) which require them to provide certain information to those who contract to have pesticide applied, and to members of the public who may be exposed to the chemicals as a result of their application to public areas. *Id.* at 119.

**6.** This desire for uniformity is particularly evident in the regulation of pesticide warnings. Pesticides are grouped into four human toxicity categories based on selected hazard indicators, which include oral, inhalation, and dermal toxicity indicators and the effects of pesticide contact with eyes or skin. *See* table at 40 C.F.R. § 156.10(h)(1). The text of the warning on the front panel of the label is based on the pesticide's toxicity category. 40 C.F.R. § 156.10(h)(1). EPA regulations dictate which of four signal words can be used on the front panel of the label, depending on the toxicity category into which the pesticide falls—"Danger" and/or "Poison" for category I; "Warning" for category II; and "Caution" for categories III and IV. 40 C.F.R. §§ 156.10(h)(1)(i)(A)—156.-10(h)(1)(i)(D). A pesticide manufacturer is *not* allowed to use "signal word(s) associated with a higher Toxicity Category" on its label, unless the EPA determines that "such labeling is necessary to prevent unreasonable adverse effects on man or the environment." 40 C.F.R. § 156.10(h)(1)(i)(E). In addition, a manufacturer cannot put more than one human hazard signal word on the front panel of the label. *Id.*

ticide would not be based on the same criteria the EPA uses to establish warnings for all other pesticides.

It might be possible for a manufacturer to comply with both federal regulations and the requirements of state common law as dictated by state law damages awards against pesticide manufacturers, *see Fere-bee*, 736 F.2d at 1541–42, but the pressure of such awards would interfere with the EPA's regulatory process because manufacturers would likely press the EPA to change its labeling requirements to reflect the jury awards so as to free the manufacturer from future tort liability for the same jury-found "inadequacies" in labeling. *See Kennan v. Dow Chem. Co.*, 717 F.Supp. 799, 806–07 (M.D.Fla.1989); *Fitzgerald v. Mallinckrodt, Inc.*, 681 F.Supp. 404, 407 (E.D.Mich.1987); *see also Palmer v. Liggett Group, Inc.* 825 F.2d 620, 627–28 (1st Cir.1987) (damages awards for inadequate labeling preempted by Federal Cigarette Labeling and Advertising Act). This case-by-case, state-by-state outside pressure on the regulatory process would hinder the development of an orderly, systematic, and uniform nationwide labeling scheme.

In this way, state common law tort suits based on labeling claims would also "stand as an obstacle to the accomplishment and execution of the full objectives of Congress" even if such suits led to "better" or "more adequate" labels, thereby serving FIFRA's goal of regulating pesticides "to protect man and his environment." A state law action which shares the same purpose as the federal law in question is preempted if it attempts to achieve that purpose by a method which interferes with the federal methods; as the Supreme Court said in *Ouellette,*

it is not enough to say that the ultimate goal of both federal and state law is to eliminate water pollution. A state law also is preempted if it interferes with the methods by which the federal statute was designed to reach this goal.

479 U.S. at 494, 107 S.Ct. at 813. For the labeling of pesticides, the EPA evaluates the toxicological data of any individual pesticide in comparison with the toxicological data for other pesticides, to achieve the protection of "man and his environment" through a labeling system that is uniform and consistent across the broad spectrum of pesticides. A jury's imposition of damages in a state tort suit premised on labeling claims would disrupt the methods by which FIFRA protects man and the environment because it would inject irrelevant considerations into the EPA's evaluation of a pesticide and its labeling and would second guess the EPA's conclusions.[7]

Allowing state common law tort actions based on labeling claims would permit state court juries to do what state legislatures and state administrative agencies are forbidden to do: impose requirements for labeling pesticides. As we have stated before, the "imposition of damages under state tort law has long been held to be a form of state regulation subject to the supremacy clause." *Taylor*, 875 F.2d at 824 n. 16. Considering our understanding of Congress's intent, we decline to permit such state regulation.

## IV. CONCLUSION

We hold that FIFRA impliedly preempts state common law tort suits against manufacturers of EPA-registered pesticides *to the extent that* such actions are based on claims of inadequate labeling.[8]

---

**7.** As the Supreme Court noted in the context of the Clean Air Act,

[s]uch penalties would compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits.... If the Vermont court ruled that respondents were entitled to the full amount of damages and injunctive relief sought in the complaint, at a minimum IPC would have to change its methods of doing

business and controlling pollution to avoid the threat of ongoing liability.... The inevitable result of such suits would be that Vermont and other States could do indirectly what they could not do directly—regulate the conduct of out-of-state concerns.

*Ouellette*, 479 U.S. at 495, 107 S.Ct. at 813.

**8.** Papas contends that even if we hold that FIFRA preempts state common law tort suits based on labeling claims, we should recognize an exception for instances in which, as Papas

The judgment of the district court is AFFIRMED.

says exists here, a manufacturer has failed to provide the EPA with complete information on the pesticide. *See Hurley v. Lederle Labs. Div. of American Cyanamid Co.*, 863 F.2d 1173, 1179–80 (5th Cir.1988). To the extent that *Hurley* purports to recognize an exception to federal preemption of common law tort labeling claims when the federal statute involved explicitly prohibits state regulation of labeling and the federal agency has received incomplete information from the manufacturer, we reject its holding at least as applied to FIFRA-regulated pesticides. Given the FIFRA regulatory scheme, it would be up to the EPA—and *not* a jury—to determine first (1) whether the information provided was incomplete or inaccurate; (2) whether the omitted information is significant enough to mandate a change in the label; and (3) how, if at all, the label should be corrected.