John DerGAZARIAN and Terri
L. DerGazarian, Plaintiffs,

v.

The DOW CHEMICAL COMPANY,
Defendant.

Civ. No. 93–5004.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Oct. 25, 1993.

Nicholas H. Patton, Young, Patton & Folsom, Texarkana, James G. Lingle, Lingle & Corley, Rogers, for plaintiffs.

Tilden P. Wright, III, Davis, Cox & Wright, Fayetteville, for defendant.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

On this 22nd day of October, 1993, comes now before the court for consideration defendant Dow Chemical Company's motion for partial summary judgment. Also before the court is plaintiffs' response to said motion. The court has considered the pleadings and is now ready to rule. For the reasons set forth below, the court finds that the motion for partial summary judgment should be and hereby is granted in part and denied in part.

### 1. Statement of the Case

In a second amended complaint filed on February 4, 1993, plaintiffs alleged that the defendant manufactured an insecticide, Dursban 2E, which was applied, in a mixture of chemicals, to plaintiffs' residence on February 15, 1990, pursuant to a pest control agreement. Plaintiffs contend that the insecticide was in a defective and unreasonably

dangerous condition when applied to the plaintiffs' residence and that Dursban 2E was the proximate cause of injuries to the plaintiffs. Plaintiffs further contend that the defendant was negligent by failing to use ordinary care in the manufacture of the insecticide, in the selection of materials used in the insecticide, and in the formulation, inspection and testing of this insecticide. Plaintiffs similarly contend that defendant was negligent in failing to warn of the dangers in the use of the insecticide and in failing to properly label the insecticide.

## 2. Motion for Partial Summary Judgment

Defendant has filed a motion for partial summary judgment asserting that several of plaintiffs' claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), codified at 7 U.S.C. § 136 *et seq.* Specifically, defendant contends that § 136v(b) expressly preempts common law actions premised upon an insecticide manufacturer's failure to warn or to properly label an insecticide. Defendant further contends that this section, together with the legislative history of the relevant portions of FIFRA, impliedly preempts these two types of common law tort actions. In support, defendant points to FIFRA regulations regarding labelling and packaging, promulgated in order to ensure uniformity, and argues that common law tort actions based upon inadequate labeling and warning would destroy the uniformity Congress sought to legislate, resulting in conflicting federal and state laws in violation of the Supremacy Clause. Additionally, defendant asserts that its labeling, formulation and testing of Dursban 2E was at all time in compliance with FIFRA requirements and approved by the EPA. Thus, defendant contends that plaintiff's claims with respect to defendant's failure to warn of the danger of the insecticide, failure to properly label the insecticide and failure to use ordinary care in the formulation, inspection and testing of Dursban 2E are preempted by provisions of FIFRA. Plaintiff's response to the summary judgment motion contends that FIFRA does not preempt any of plaintiff's claims.

## 3. Standard of Review

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56. The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir.1979), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The Court has recently reviewed the burdens of the respective parties in connection with a summary judgment motion. In *Counts v. M.K.–Ferguson Co.*, 862 F.2d 1338 (8th Cir.1988), the court stated:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, '[to] point[ ] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails

to carry that burden, summary judgment should be granted.

*Id.* at 1339, *quoting Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original). However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.*, 883 F.2d 594, 598 (8th Cir. 1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990) (*citing Trnka v. Elanco Products Co.*, 709 F.2d 1223 (8th Cir.1983).

### 4. The Preemption Doctrine

■ Defendant contends that FIFRA preempts certain of the plaintiffs' state law claims. The preemption doctrine is based upon the Supremacy clause of Article Six of the Constitution. U.S. Const. art. VI, cl. 2. The Supremacy Clause invalidates state laws that "interfere with, or are contrary to" federal law. *Hillsborough County, Fla. v. Automated Medical Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985), citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) (Marshall, C.J.). The different forms of preemption may be found in the familiar Supreme Court opinion of *Louisiana Public Service Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986):

> The Supremacy Clause of Article VI of the Constitution provides Congress with the power to pre-empt state law. Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), when there is outright or actual conflict between federal and state law, *e.g. Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), where there is implicit in federal law a barrier to state regulation, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct.

2890, 77 L.Ed.2d 490 (1983), where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

> \*   \*   \*   \*   \*   \*

> The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law.

476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369, 381–82 (1986).

### 5. Federal Insecticide, Fungicide, and Rodenticide Act

Any preemption analysis must originate with the source of the alleged preemption. FIFRA was enacted in 1947 to replace the government's first effort at pesticide regulation, the Insecticide Act of 1910. *Wisconsin Public Intervenor v. Mortier*, —— U.S. ——, ——, 111 S.Ct. 2476, 2479, 115 L.Ed.2d 532 (1991). Like its predecessor, FIFRA as originally adopted "was primarily a licensing and labeling statute," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991, 104 S.Ct. 2862, 2866, 81 L.Ed.2d 815 (1984), "designed to work in harmony with the uniform state insecticide, fungicide and rodenticide act which was adopted in many States." S.Rep. No. 92–838, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.Code Cong. & Admin.News 3993, 3999.

In 1972, environmental and safety concerns led Congress to undertake a comprehensive revision of FIFRA through the Federal Environmental Pesticide Control Act. These amendments significantly strengthened FIFRA's registration and labeling standards for pesticides and increased the EPA's authority for enforcement. *See Ruckelshaus, supra;* 7 U.S.C. § 136a.

FIFRA's legislative history indicates that Congress intended to establish a comprehensive regulatory scheme in which the EPA

Administrator would be responsible for determining whether to register a pesticide, and if so, under what circumstances. Congress recognized that the control of pesticides required a careful balancing of benefit against risk:

> While appropriate pesticides properly used are essential to man and his environment, many constitute poisons that are too dangerous to be used for any purpose. Others are dangerous unless used extremely carefully.... Pesticides therefore have important environmental effects, both beneficial and deleterious. Their wise control based on a careful balancing of benefit versus risk to determine what is best for man is essential.

S.Rep. No. 92–838, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News at 3996. The EPA Administrator was designated as the entity to conduct the balancing analysis:

> The question [the Administrator] must decide is "Is it better for man and the environment to register this pesticide, or is it better that this pesticide be banned?" He must consider hazards to farmworkers, hazards to birds and animals and children yet unborn. He must consider the need for food and clothing and forest products, forest and grassland cover to keep the rain when it falls, prevent floods, provide clear water. He must consider aesthetic values, the beauty and inspiration of nature, the comfort and health of man. All these factors he must consider giving each its due. No one should be given undue consideration, no one should be singled out for special mention, no one should be considered as a "vital criterion."
>
> For each pesticide the Administrator must ask the same question.... In each case the Administrator must take into account all relevant factors and decide whether it is better for man and the environment that this product be registered.

*Id.* at 4032–33.

Under FIFRA, the Administrator is required to register a pesticide if he determines that, when considered with any restrictions imposed on it, the pesticide warrants the proposed claims made for it; its labeling and other materials comply with FIFRA requirements; it will perform its intended purpose without unreasonable adverse effects on the environment; and when used in accordance with common practice, it will not generally cause unreasonable adverse effects on the environment. *See* 7 U.S.C. § 136a(c)(5).

Within this comprehensive federal regulatory scheme for pesticides, Congress delineated the extent to which the states could regulate pesticides:

§ 136v  Authority of States

(a) In general

A state may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v.

A report accompanying the bill, as originally reported out of the House Committee, also indicated the limits on state power due to the division of authority between the state and federal governments: "In dividing the responsibility between the States and Federal Government for the management of an effective pesticide program, the Committee had adopted language which is intended to completely preempt State authority in regard to labeling and packaging." H.R.Rep. 92–511, 92d Cong., 1st Sess. 16 (1971). Congress recognized that, while the intent of this provision was "to leave the States the authority to impose stricter regulation on pesticides use than required under the Act," subsection (b) preempted "any State labeling or packaging requirements differing from such requirements under the Act." S.Rep. 92–838, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Admin.News at 4021.

### 6. Applicable Law

The issue before the court is whether § 136v(b) of FIFRA preempts state common law actions premised upon an insecticide

manufacturer's failure to warn or properly label an insecticide. Although without a consensus, this issue recently has received a considerable amount of attention from the judiciary. Six circuit courts have considered the issue, five within the last two years, with a resultant split of authority on the issue. Likewise, a myriad of lower courts have heard the FIFRA preemption issue presently pending before the court. Numerous districts have adopted the majority view, i.e. FIFRA preempts state common law tort claims based upon a failure to adequately label or package.[1] Others have adopted the minority view promulgated by the D.C. Circuit[2] in *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

### a. D.C. Circuit

The first circuit decision on this issue was *Ferebee v. Chevron Chem. Co., supra.* Ferebee, an agricultural worker, contracted pulmonary fibrosis as a result of long-term skin exposure to dilute solutions of Paraquat, a herbicide distributed in the United States by Chevron. A second trial by Ferebee's estate resulted in a $60,000.00 verdict against Chevron on the theory that Chevron's failure to label Paraquat in a manner which adequately warned of the herbicide's long-term dangers made Chevron strictly liable for Ferebee's injuries. *Id.* at 1532.

On appeal, Chevron argued, *inter alia,* that because Paraquat is sold only when accompanied by an EPA approved label, a state jury may not find that label inadequate. *Id.* at 1539. Chevron similarly argued that federal law preempts state law actions based on the theory of inadequate labeling. *Id.*

The court of appeals rejected both arguments.

First, the court examined FIFRA, concluding that Chevron's argument "misunderstands the nature of the determination made by the EPA and misconceives the relation between federal and state law." *Id.* at 1540. The court stated that

> [t]he fact that EPA has determined that Chevron's label is adequate *for purposes of FIFRA* does not compel a jury to find that the label is also adequate *for purposes of state tort law* as well. The purposes of FIFRA and those of state tort law may be quite distinct. FIFRA aims at ensuring that, from a cost-benefit point of view, Paraquat as labelled does not produce "unreasonable adverse effects on the environment." State tort law, in contrast, may have broad compensatory goals; conceivably, a label may be inadequate under state law if that label, while sufficient under a cost-benefit standard, nonetheless fails to warn against any significant risk.

*Id.* at 1540. The court concluded that unless FIFRA preempts a state from making labeling determination, a state may find a product inadequately labeled despite EPA standards. *Id.* The court then turned to the heart of Chevron's claim: whether § 136v(b) of FIFRA preempts states from reconsidering product labeling. *Id.*

Chevron argued that a damage action based upon the inadequacy of a label has a regulatory aim and this is what FIFRA expressly preempts by providing that a state "shall not impose or continue in effect any requirements for labeling . . . in addition to or different from those required under this subchapter." *Id.,* quoting 7 U.S.C.

**1.** *See Levesque v. Miles, Inc.,* 816 F.Supp. 61 (D.N.H.1993); *Young v. American Cyanamid Co.,* 786 F.Supp. 781 (E.D.Ark.1991); *Evenson v. Osmose Wood Preserving, Inc.,* 760 F.Supp. 1345 (S.D.Ind.1990); *Hurt v. Dow Chemical Co.,* 759 F.Supp. 556 (E.D.Mo.1990); *Kennan v. Dow Chemical Co.,* 717 F.Supp. 799 (M.D.Fla.1989); *Fisher v. Chevron Chemical Co.,* 716 F.Supp. 1283 (W.D.Mo.1989); *Villari v. Terminix International, Inc.,* 692 F.Supp. 568 (E.D.Pa.1988); and *Fitzgerald v. Mallinckrodt, Inc.,* 681 F.Supp. 404 (E.D.Mich.1987). *See also Yowell v. Chevron Chemical Co.,* 836 S.W.2d 62 (Mo.App.1992); and *Davidson v. Velsicol Chemical,* 108 Nev. 591,

834 P.2d 931 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1944, 123 L.Ed.2d 650 (1993).

**2.** *See MacDonald v. Monsanto Co.,* 813 F.Supp. 1258 (E.D.Tex.1993); *Couture v. Dow Chemical U.S.A.,* 804 F.Supp. 1298 (D.Mont.1992); *Burke v. Dow Chemical Co.,* 797 F.Supp. 1128 (E.D.N.Y.1992); *Thornton v. Fondren Green Apartments,* 788 F.Supp. 928 (S.D.Tex.1992); *Montana Pole & Treating Plant v. I.F. Laucks & Co.,* 775 F.Supp. 1339 (D.Mont.1991), *aff'd,* 993 F.2d 676 (9th Cir.1993); and *Riden v. I.C.I. Americas, Inc.,* 763 F.Supp. 1500 (W.D.Mo. 1991).

§ 136v(b). The court noted, however, that "[d]amage actions typically ... have *both* regulatory and compensatory aims." *Id.* The court reasoned that

> [t]he verdict itself does not command Chevron to alter its label—the verdict merely tells Chevron that, if it chooses to continue selling Paraquat in Maryland, it may have to compensate for some of the resulting injuries. That may in some sense impose a burden on the sale of Paraquat in Maryland, but it is not equivalent to a direct regulatory command that Chevron change its label. Chevron can comply with both federal and state law by continuing to use the EPA-approved label and by simultaneously paying damages to successful tort plaintiffs such as Mr. Ferebee.

*Id.* at 1541. The court supplied additional analysis in support of its contention, stating that imposition of this "dual obligation" is permissible under the provisions of FIFRA which allow states to regulate by imposing more stringent restraints on the use of EPA-approved pesticides. *Id.,* citing 7 U.S.C. § 136v(a) (allowing a state to "regulate the sale or use of any federally registered pesticide...."). The court concluded that "if a state chooses to restrict pesticide use by requiring that the manufacturer compensate for all injuries or for some injuries resulting from the *use* of a pesticide, federal law stands as no barrier." *Id.*

Additionally, the court noted that tort recoveries "may also promote legitimate regulatory aims.... [by] aid[ing] in the exposure of new dangers associated with pesticides." *Id.* at 1541. This, in turn, the court reasoned, might lead manufacturers to seek more detailed EPA labeling of their products or cause the EPA to independently revise labels in light of new information provided by common law actions. *Id.* Additionally, the court posited that damage awards may provide manufacturers "added dynamic incentives" to keep abreast of possible injuries stemming form use of their product. *Id.*

Recognizing the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Rice v. Sante Fe Elevator Co., supra,*

the court noted that the provision of tort remedies is traditionally and properly within the scope of state powers. Moreover, the court found no explicit or express preemption of state damage actions; rather, the court determined that FIFRA merely precludes a state from directly ordering changes in EPA-approved labels. *Id.* at 1542. Additionally, the court found that compliance with both federal law and state law "cannot be said to be impossible." *Id.* And last, the court found that state damage actions "do not stand as an obstacle to the accomplishment of FIFRA's purposes." *Id.* Thus, finding the federal legislation acted as the "floor of safe conduct" rather than the "ceiling," the court held that "Maryland is entitled to control the use of Paraquat for compensatory aims by holding Chevron liable for injuries that could have been prevented by a more adequate label." *Id.* at 1541–43. The Supreme Court denied certiorari in *Ferebee v. Chevron Chemical Co.,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1985).

### b. Supreme Court

Five circuit courts of appeal have found preemption of state common law claims for inadequate labeling or packaging, relying upon, at least in part, the Supreme Court opinion of *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Rose Cipollone began smoking cigarettes in 1942, dying of lung cancer in 1984. Her son brought an action against the Liggett Group, a producer of cigarettes, claiming that under New Jersey common law, they were responsible for the death of Rose Cipollone in that they breached express warranties contained in advertising, failed to warn customers about the hazards of smoking, fraudulently misrepresented those hazards to consumers and conspired to deprive the public of medical and scientific information about smoking. *Id.*

The district court concluded that the federal cigarette acts did not preempt Cipollone's common law actions. *Cipollone v. Liggett Group, Inc.,* 593 F.Supp. 1146 (D.N.J.1984). Accepting an interlocutory appeal, the Court of Appeals for the Third Circuit reversed, finding that the common law claims were preempted by the federal statutes because

such actions would conflict with federal law, *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181 (3d Cir.1986). The circuit court, however, did not identify which of Cipollone's claims were preempted under this analysis. The Supreme Court denied certiorari and the case returned to the district court. Complying with the mandate of the court of appeals, the district court found that the failure to warn, express warranty, fraudulent misrepresentation and conspiracy to defraud claims were barred to the extent that they relied upon Liggett Group's advertising, promotional and public relations activities after January 1, 1966, the effective date of the 1965 Federal Cigarette Labeling and Advertising Act. As the highest state courts in Minnesota and New Jersey had held that the federal cigarette acts did not preempt similar common law claims, the Supreme Court granted certiorari to resolve the conflict. *Cipollone v. Liggett Group, Inc.*, 499 U.S. 935, 111 S.Ct. 1386, 113 L.Ed.2d 443 (1991).

Before the Court, Liggett Group argued that the Federal Cigarette Labeling and Advertising Act, enacted in 1965, and its successor, the Public Health Cigarette Smoking Act of 1969, protected Liggett from any liability based upon their conduct after 1965. The purpose of 1965 Act was twofold: (1) to adequately inform the public that cigarette smoking may be hazardous to health and (2) to protect that national economy form the burden imposed by diverse, nonuniform and confusing cigarette labeling and advertising regulations. In furtherance of the first purpose, § 4 of the 1965 Act made it unlawful to sell or distribute any cigarettes in the United States unless the package bore a conspicuous label stating: "CAUTION: CIGARETTE SMOKING MAY BE HAZARDOUS TO YOUR HEALTH." In furtherance of the second purpose, section 5 of the 1965 Act provided as follows:

(a) No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package.

(b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

The 1965 Act was effective on January 1, 1966, however, the provisions affecting the regulation of cigarette advertising terminated on July 1, 1969.

As termination of these provisions approached, Congress passed the Public Health Cigarette Smoking Act of 1969, which amended the 1965 Act in several ways. First, the 1969 Act required a warning on cigarette packages that smoking "is dangerous" rather than warning that smoking "may be hazardous." Second, the 1969 Act banned all advertising of cigarettes communicated electronically. Third, the 1969 Act revised the preemption section of the 1965 Act:

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with provisions of this Act.

As this modification of § 5(b) narrowed the preemption to provision to prohibit only restrictions "imposed under state law," the way was cleared for the FTC to extend the warning-label requirement to print advertisements which it did in 1972.

The court of appeals was not convinced that the preemption provision in the 1969 Act expressly encompassed state common law claims nor that Congress intended to exert exclusive federal control over every aspect of cigarettes. Considering the statute as a whole and the potential regulatory effect of common law action, however, the court of appeals concluded that Congress impliedly preempted common law claims challenging the adequacy of the warnings on labels or in advertising or promotional activities. *Cipollone*, 789 F.2d at 185–87.

The Supreme Court found, however, that "the preemptive scope of the 1965 Act and the 1969 Act is governed entirely by the *express language* in § 5 of each Act." *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2618 (emphasis added). The Court offered the following explanation for its conclusion:

When Congress has considered the issue of pre-emption and has included in the enact-

ed legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," *Malone v. White Motor Corp.,* 435 U.S. at [497] 505, 98 S.Ct. [1185] at 1190, 55 L.Ed.2d 443 [ (1978) ], "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. *California Federal Savings & Loan Assn. v. Guerra,* 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987) (opinion of Marshall, J.). Such reasoning is a variant of the familiar principle of *expression unius est exclusion alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted. In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond § 5 of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections. As the 1965 and 1969 provisions differ substantially, we consider each in turn.

*Cipollone,* ―― U.S. at ――, 112 S.Ct. at 2618.

Turning first to the 1965 Act, the Court posited that a narrow reading of § 5 was warranted "in light of the presumption against the preemption of state police power regulations." *Id.* Section 5(b) provided that *"no statement* relating to smoking and health shall be required in the advertising of [properly labeled] cigarettes." Section 5(a) used the same phrase, *"no statement,"* with regard to labeling, referring to the warning contained in § 4, which set forth verbatim the warning Congress thought appropriate.

The Court determined that the warning contained in § 4 did not "by its own effect foreclose additional obligations under state law" because promulgation by Congress of "a particular warning label does not automatically pre-empt a regulatory field." *Id.* The Court also found that "there is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common law damages actions." *Id.* Thus, the Court concluded that "[a]ll of these considerations indicate that § 5 [of the 1965 Act] is best read as

having superseded only positive enactments by legislatures or administrative agencies that mandate particular warning labels." *Id.* ―― U.S. at ――, 112 S.Ct. at 2618–19. The Court continued, stating that this reading comports with the purpose of the Act which was "to avoid 'diverse, nonuniform, and confusing labeling and advertising regulations'" and finding that "the term 'regulation' most naturally refers to positive enactments ... not to common law damages actions." *Id.* ―― U.S. at ――, 112 S.Ct. at 2619. Thus, the Court found that state common law damages actions were not preempted by § 5 of the 1965 Act. *Id.*

Turning then to the 1969 Act, the Court found the plain language of its preemption provision to be much broader than that employed by the 1965 Act. *Id.* ―― U.S. at ――, 112 S.Ct. at 2619. First, the Court pointed out that 1969 Act bars not only "statements," but rather "requirement[s] or prohibition[s] ... imposed under state law." *Id.* Second, the 1969 Act reaches beyond "advertising" to "advertising and promotion of cigarettes."

Cipollone argued that although § 5(b) was broadened by the 1969 Act, common law damages do not impose "requirement[s] or prohibition[s]" and Congress must have intended only to trump "state statute[s], injunction[s] and executive pronouncement[s]." *Id.* ―― U.S. at ――, 112 S.Ct. at 2620. The Supreme Court, however, disagreed, stating that "[t]he phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." *Id.* The Court reiterated that "regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Id.,* citing *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959).

Moreover, the Court found that "common law damages actions ... are premised upon the existence of a legal duty and it is difficult to say that such actions do not impose "re-

quirements or prohibitions." *Id.* —— U.S. at ——, 112 S.Ct. at 2620. The Court found this legal duty to be the distinction between the 1965 and the 1969 Acts:

It is in this way that the 1969 version of the § 5(b) differs from its predecessor: Whereas the common law would not normally require a vendor to use any specific *statement* on its package or in its advertisements, it is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions.* We therefore reject [Cipollone's] argument that the phrase "requirement or prohibition" limits the 1969 Act's pre-emptive scope to positive enactments by legislatures and agencies.

*Id.*

Cipollone then argued that the phrase "imposed under State law" excluded common law damages actions from the sweep of § 5(b). The Court also rejected this argument, recognizing the long standing principle that "state law" includes common law as well as statutes and regulations. *Id.,* citing *Erie R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Court noted that in its recent opinion of *Norfolk & Western R. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), the phrase "all other law, including State and municipal law" was found to provide no distinction "between positive enactments and common-law rules of liability." 499 U.S. at 128, 111 S.Ct. at 1163. Thus, the Court found that "§ 5(b)'s pre-emption of 'state law' cannot fairly be limited to positive enactments." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2621.

The Court carefully added, however, that § 5(b) does not automatically preempt *all* common law claims but rather, an analysis of each claim must be conducted to determine if it in fact is preempted. *Id.* —— U.S. at ——, 112 S.Ct. at 2621. Examining Cipollone's failure to warn claims, the Court found that these claims were preempted "to the extent that they rely on a state law 'requirement and prohibition' ... with respect to ... advertising or promotion." *Id.* The Court concluded:

Thus, insofar as claims under either failure to warn theory require a showing that [Liggett Group's] post–1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted. The Act does not, however, pre-empt [Cipollone's] claims that rely solely on [Liggett Group's] testing or research practices or other actions unrelated to advertising or promotion.

*Id.* —— U.S. at ——, 112 S.Ct. at 2621–22. The Court went on to find that Cipollone's claims based on express warranty, intentional fraud and misrepresentation or conspiracy were not preempted by either Act. *Id.* —— U.S. at ——, 112 S.Ct. at 2622–2625.

One must note that *Cipollone* is a plurality opinion. Justices Stevens, Rehnquist, White, Blackmun, O'Connor, Kennedy and Souter joined in the portion of the opinion determining that state common law damages actions were not preempted by the 1965 Act. However, only Justices Steven, Rehnquist, White and O'Connor agreed that the same actions were also preempted by the 1969 Act. Justice Blackmun dissented with that portion of the decision and was joined by Justices Kennedy and Souter. Justice Scalia also dissented and was joined by Justice Thomas, concurring in the judgment but dissenting in part. Justice Scalia's concurrence stated that he "agree[d]" with the following statements in the plurality opinion:

"that 'the language of the [1969] Act plainly reaches beyond [positive] enactments,'; that the general tort—law duties [Cipollone] invokes against the cigarette companies can, as a general matter, impose 'requirement[s] or prohibition[s]' within the meaning of § 5(b) of the 1969 Act; and that the phrase 'State law' as used in that provision embraces state common law."

*Cipollone,* —— U.S. at ——, 112 S.Ct. at 2634. Justice Scalia also referred to the plurality opinion's "correct disposition of petitioner's post–1969 failure to warn claims." *Id.* —— U.S. at ——, 112 S.Ct. at 2637. Justice Scalia's partial disagreement with the plurality was that he would have found *complete preemption* of all Cipollone's claims un-

der both the 1965 and 1969 Acts.[3] *Id.* —— U.S. at ——, 112 S.Ct. at 2632.

Like the D.C. Circuit in *Ferebee,* the Courts of Appeal for the Tenth and Eleventh Circuits decided the FIFRA preemption issue prior to the Supreme Court's opinion in *Cipollone. See Arkansas–Platte & Gulf Partnerships v. Van Waters & Rogers, Inc.,* 959 F.2d 158 (10th Cir.1992); and *Papas v. Upjohn Co.,* 926 F.2d 1019 (11th Cir.1991). Following *Cipollone,* the Supreme Court granted certiorari in both cases following, vacating and remanding both in light of *Cipollone. See Arkansas–Platte,* —— U.S. ——, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992); and *Papas,* —— U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). The Court of Appeals for the Fourth Circuit also decided the FIFRA preemption issue five days before the *Cipollone* opinion was handed down. *See Worm v. American Cyanamid Co.,* 970 F.2d 1301 (4th Cir.1992). The decision, however, was remanded to the district court and when it reached the appellate court the second time, the court of appeals conducted its analysis in light of *Cipollone. Worm II,* 5 F.3d 744 (1993). As the court believes that an understanding of these cases is critical to disposition of the issues presently before the court, each will be discussed in turn.

### c. Tenth Circuit

In 1985, Arkansas–Platte had succeeded to ownership of property located in Colorado which was later diagnosed with pentachlorophenol poisoning resulting from use of "Dowicide 7," a pentachlorophenol product, on the property from 1960 to 1972. Arkansas–Platte filed, *inter alia,* a negligence action premised on the manufacturer's failure to warn of the Dowicide's environmental hazards. In a motion for summary judgment, the manufacturer asserted the doctrine of preemption however the district court denied the motion, finding no express or implied preemption by FIFRA of state tort claims based on negligent failure to warn. *Arkansas–Platte,* 748 F.Supp. 1474, 1482–84 (D.Colo.1990).

The preemption issue was certified for interlocutory appeal to the Court of Appeals for the Tenth Circuit. In determining whether FIFRA preempted state tort claims based on labeling and alleged failure to warn, the court reasoned that "damage awards based on failure to warn would constitute ad hoc determinations of the adequacy of statutory labeling standards." *Arkansas–Platte,* 959 F.2d 158, 162 (10th Cir.1992). According to the court, "[t]his would hinder the accomplishment of the full purpose of § 136v(b), which is to ensure uniform labeling standards." *Id.* The court specifically rejected the "choice of reaction" analysis employed by the *Ferebee* court, finding that "[a] business choice between paying damages and changing the label is only notional." *Id.* The court found the rationale of a First Circuit decision particularly persuasive:

> Once a jury has found a label inadequate under state law, and the manufacturer liable for damages for negligently employing it, it is unthinkable that any manufacturer would not immediately take steps to minimize its exposure to continued liability. The most obvious change it can take ... is to change the label.

*Id.* at 162, quoting *Palmer v. Liggett Group, Inc.,* 825 F.2d 620 (1st Cir.1987). Thus, the court concluded that a decision to change a label "cannot be consistent with FIFRA's preclusion of 'any requirements for labeling or packaging in addition to or different from' the statutory mandate" of § 136v(b). *Id.* at 162–63.

Finding that FIFRA impliedly preempted state tort actions based on labeling and failure to warn, the court also relied upon the Supreme Court decision of *Wisconsin Pub. Intervenor v. Mortier,* —— U.S. ——, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). In *Mortier,* a Wisconsin town had attached certain use restrictions to a permit for pesticide spraying and a claim was made that the ordinance containing the use restrictions was preempted by FIFRA. The Supreme Court disagreed, holding that FIFRA provisions

---

3. One court has concluded that the plurality opinion, coupled with the opinion of Justice Scalia in which Justice Thomas joins, constitutes the view of the Court because six members of the court concurred in the judgment. *See King v. E.I. Dupont de Nemours and Co.,* 996 F.2d 1346, 1349 (1st Cir.1993).

---

did not preempt political subdivisions from regulating the *use* of pesticides. *Id.* —— U.S. at ——, 111 S.Ct. at 2482. According to *Mortier*, the specific grant of state authority in § 136v(a) ensures that states can "continue to regulate *use and sales* even where, such as with regard to the banning of *mislabeled products, a narrow pre-emptive overlap* might occur." *Id.* —— U.S. at ——, 111 S.Ct. at 2486.

The *Arkansas–Platte* court found that this "narrow preemptive lap" was precisely the issue before the court, relying upon the Court's dicta in *Mortier* to resolve the issue:

> [F]ield pre-emption cannot be inferred. In the first place, § 136v itself undercuts such an inference. The provision immediately following the statute's grant of regulatory authority to the States declares that "[s]uch State shall not impose or continue in effect any requirements for labeling and packaging in addition to or different from those required under" FIFRA. 7 U.S.C. § 136v(b). *This language would be pure surplusage if Congress had intended to occupy the entire field of pesticide regulation.*

*Arkansas–Platte,* 959 F.2d at 163, quoting *Mortier,* —— U.S. at ——, 111 S.Ct. at 2486 (emphasis added). Stating that *Mortier* had concluded that Congress had not occupied the *entire* field of pesticide regulation, the *Arkansas–Platte* court read *Mortier* also to conclude that "Congress had impliedly preempted state regulation in the more narrow filed of labeling." *Arkansas–Platte,* 959 F.2d at 163. Thus, the *Arkansas–Platte* court adopted the *Mortier* dicta in finding implied preemption of state tort claims based on labeling and alleged failure to warn. *Id.* at 163–64. The court reversed the findings of the district court and remanded for further proceedings. *Id.* at 164.

The Supreme Court granted certiorari, vacated the opinion and remanded the case to the circuit court in light of *Cipollone. Arkansas–Platte,* —— U.S. ——, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992).

On remand, the court determined that it must adhere to its former opinion, concluding that *"Cipollone* does not require a conclusion different than the one we reached initially."

*Arkansas–Platte II,* 981 F.2d 1177, 1178–79. Examining and comparing the preemption language of the Public Health Cigarette Smoking Act and FIFRA, the court noted that "[a]lthough the words employed in § 136v(b) of FIFRA are different from those in § 5(b) of the Cigarette Smoking Act, their effect is the same." *Id.* at 1179. The court found the language of § 136v(b) to be as inclusive and as broad as the language of § 5(b) of the 1969 Act, found by the *Cipollone* court to preempt common law failure to warn claims. The court also believed that "the prohibition of 'any' requirement is the functional equivalent of 'no' requirement. We see no difference between the operative effect of the two acts." *Id.* at 1179.

Moreover, the court found that Congress "gave a 'reliable indicium of congressional intent with respect to state authority,'" by circumscribing "the area of labeling and packaging and preserv[ing] it only for federal law." *Id.* at 1179. Accordingly, the court recognized that the preemption does not extend only to positive legislative acts:

> When one looks to the purpose underlying both legislative regulation of labeling and packaging and a state common law duty to warn, it become evident those purposes are the same. Indeed, a state common law duty to warn is nothing more than a duty to label a product to provide information. In that sense, the common law duty is no less a "requirement" in the preemption scheme that a state statute imposing the same burden. The objectives of the common law duty and a regulatory statute are the same. Both address a manufacturer's duty to convey information about a product through the medium of a label. That a common law action can result in an award of damages to an injured party does not detract from the ultimate purpose of imposing a duty to warn the users of a product about its potential dangers or other properties. Therefore, we believe it only logical to hold that the common law duty to warn is subjected to the same federal preemptive constraints as a state statute.

*Id.* at 1179. Thus, finding *Cipollone* supportive of the court's previous judgment, the

court adhered to its opinion announced in *Arkansas–Platte I,* 959 F.2d 158 (10th Cir. 1992). The Supreme Court recently has denied certiorari in *Arkansas–Platte II,* —— U.S. ——, 114 S.Ct. 60, —— L.Ed.2d —— (1993).

### d. Eleventh Circuit

The Court of Appeals for the Eleventh Circuit also has considered the FIFRA preemption issue in *Papas v. Upjohn Co.,* 926 F.2d 1019 (11th Cir.1991). Minas and Ollie Papas filed a complaint against Upjohn Company and Zoecon Corporation, alleging that certain pesticides Minas applied to animals during his employment at a humane society resulted in health problems. The Papas' claims depended in whole or in part on a theory of inadequate labeling.

The district court granted Zoecon's partial summary judgment, agreeing with Zoecon that FIFRA preempted the inadequate labeling claims. The issue was certified for interlocutory appeal where the court of appeals affirmed the grant of summary judgment, finding the state common law tort claims preempted.

Proceeding under a traditional preemption analysis, the court of appeals, "mindful that 'Congress has long demonstrated an aptitude for expressly barring common law actions when it so desires,'" passed over the question of express preemption. *Id.* at 1024. Instead, the court turned to the issue of "whether federal preemption of state common law tort claims based on labeling deficiencies can be *inferred* from FIFRA and the labeling regulations promulgated under it." *Id.* (emphasis added).

Looking to § 136v(b), the court concluded since no state can impose labeling or packaging different from that required by FIFRA, "the federal government—through the EPA—has the sole and exclusive right to regulate pesticide labels." *Id.* The court recognized that the EPA has regulated almost every aspect of pesticide labeling: the manner in which warnings are presented—specific requirements about content, placement, type, size and prominence of warnings; the content of the warnings—including the risks to humans and animals, toxicological

hazards to children and to the environment as well as physical and chemical hazards; the proscribed treatment or first aid; and the directions for use. *Id.* at 1024 (citations to regulations omitted). The court noted that "[i]t is in light of these comprehensive regulations that the EPA approves a specific label for each pesticide." *Id.*

The court determined that FIFRA impliedly preempts state common law tort claims based upon inadequate labeling in several ways. First, the court concluded that the labeling prohibition of § 136v(b), coupled with the federal labeling regulations adopted pursuant to FIFRA, indicates that Congress "has occupied the entire field of labeling regulation, leaving no room for the states to supplement federal law, even by means of state common law tort actions." *Id.* at 1025. Second, the court held that a jury determination of label inadequacy "would result in a direct conflict with federal law" as the EPA previously would have "determine[d] the reasonableness of the risks to man and environment...." and required labeling "adequate to protect against health risks." *Id.*

Additionally, the court found that state common law actions for inadequate labeling would "stand as an obstacle to the accomplishment and execution of the full objectives of Congress." *Id.* Recognizing one of the EPA's objectives as uniform labeling of different brands of the same pesticide, different pesticides performing the same function and different pesticides posing the same or similar risks, the court concluded that a jury finding of labeling inadequacy "would require that the manufacturer change the label or risk additional suits for damages," and

> would destroy the uniformity that Congress and the EPA seeks to achieve in pesticide labeling because the warning for that pesticide would not be based on the same criteria the EPA uses to establish warnings for all other pesticides.

*Id.* at 1025–26. And while it might be possible for a manufacturer to comply with both federal regulations and state common law, the court noted that the "pressure" of common law awards "would likely press the EPA to change its labeling requirements ... to free the manufacturer from future tort liabili-

ty" and therefore, interrupt the "EPA's regulatory process" by hindering the "development of an orderly, systematic, and uniform nationwide labeling scheme." *Id.* at 1026. The court found that even if common law suits accomplished the objectives of FIFRA by leading to "better or more adequate labels," the actions are preempted since they achieve that purpose "by a method which interferes with the federal methods...." *Id.* at 1026. By injecting additional and possibly even irrelevant considerations into labeling adequacy determinations, a jury would disrupt the EPA's careful balanced evaluation aimed at achieving "protection of man and his environment." *Id.* The court concluded by stating:

> Allowing state common law tort actions based on labeling claims would permit state court juries to do what state legislatures and state administrative agencies are forbidden to do: impose requirements for labeling pesticides. As we have stated before, the "imposition of damages under state law has long been held to be a form of state regulation subject to the supremacy clause." (citation omitted). Considering our understanding of Congress' intent, we decline to permit such state regulation.

*Id.* at 1026. Thus, the court held that "FIFRA *impliedly preempts* state common law tort suits against manufacturers of EPA-registered pesticides *to the extent that* such actions are based on claims of inadequate labeling." *Id.*

Like *Arkansas–Platte I,* the Supreme Court granted certiorari, vacated the *Papas I* opinion and remanded the case to the circuit court in light of *Cipollone. Papas,* —— U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). However, while the *Arkansas–Platte II* court adhered to its former opinion, concluding that "*Cipollone* does not require a conclusion different than the one we reached initially" the *Papas II* court, noting that the analysis in *Papas I* was confined to the implied preemption doctrine, stated that "[h]aving looked at *Cipollone,* we conclude that FIFRA *expressly* preempts the Papases' claims to the extent that they are based on inadequate labeling or packaging." *Papas*

*II,* 985 F.2d 516, 517 (11th Cir.1992) (emphasis added).

The *Papas II* court wrote that, similar to the statutes at issue in *Cipollone,* "FIFRA contains a provision explicitly addressing, and providing a reliable indicium of, state authority." *Id.* at 517. Viewing the *Cipollone* decision as a clarification that the term "requirements," as found in the preemption provisions of the cigarette acts, "sweeps broadly and suggests no distinction between positive enactments and the common law," the court determined that § 136v(b), the preemption section of FIFRA, precluded state common law tort actions based on inadequate labeling or packaging by prohibiting "requirements for labeling or packaging in addition to or different from" requirements imposed by FIFRA. *Id.* at 518. The court held that the Papases' claims requiring a showing that the labeling or packaging "should have included additional, or more clearly stated, warnings" were preempted by FIFRA, noting that "the *Cipollone* opinion dictates, under an express pre-emption analysis, the same result we reached earlier under the implied pre-emption doctrine." *Id.* The Supreme Court recently has denied certiorari in *Papas v. Upjohn Co.,* —— U.S. ——, 114 S.Ct. 300, —— L.Ed.2d —— (1993).

### e. Fourth Circuit

The Court of Appeals for the Fourth Circuit was the only other appellate court to decide the issue prior to *Cipollone. See Worm v. American Cyanamid Co.,* 970 F.2d 1301 (4th Cir.1992). The Worms, engaged in the commercial farming of soybeans and corn, brought an action essentially alleging that American Cyanamid failed in its duty to warn of the defective condition of a weed killer known as "Scepter." The district court, concluding that FIFRA does not provide for a private cause of action for inadequate labeling of pesticides, found that Worm's claims were preempted. *Id.* at 1304.

Examining the language of § 136v(b), the Fourth Circuit found that "there is no language" expressing Congress' intent to occupy the entire field of pesticide regulation. *Id.* at 1305. Stating that "Congress has not failed to make such preemption clear when it desired to do so," the court declined to find

express preemption, instead turning to the doctrine of implied preemption. *Id.* at 1305–05.

Like the *Arkansas–Platte I* court, guidance on implied preemption was found in the Supreme Court opinion of *Mortier, supra.* Stating that *Mortier* "reach[ed] the conclusion that FIFRA does not preempt the field of regulating pesticides, expressly or by implication," the court found that "there is simply no evidence that Congress intended to supplant state authority in a field beyond the applicable scope of its own legislation." *Id.* at 1306. The court further found that § 136v(b) contains

> only a statement of the limits of the federal objectives underlying FIFRA for purposes of a Supremacy Clause analysis, and not an intent to usurp all power, even in the narrow field of pesticide labeling.

*Id.* Thus, finding no implied preemption, the court turned to resolve whether it is "impossible to comply with both state and federal [labeling] law" or whether "state [labeling] law stands as an obstacle to the accomplishment of the full purposes and objectives" of FIFRA. *Id.* (citations omitted).

Positing that only state requirements "in addition to or different from" the federal standards will frustrate FIFRA's purpose, the court noted that consistent state laws "will not be said to be in conflict with federal law." *Id.* at 1306–07. However, the court rejected the Worms' argument that state law providing merely a "remedy for failure to provide an adequate warning . . . can lead only to the payment of damages and not to a required label alteration." *Id.* at 1307. The court found the "distinction illusory:"

> If federal law mandates a specific label and permits nothing additional or different, it can hardly be urged that a state tort duty based on a warning requirement that is more elaborate and different does not conflict. The manufacturer in that case cannot comply with both. Implicit in the Worm's argument is a notion that common law tort duties are not regulatory. But surely a jury verdict resulting from a pesticide manufacturer's failure to warn of the dangers of the product has an effect no different from a legislatively enacted state

regulation requiring the insertion of a specific warning on the pesticide label.

\* \* \* \* \* \*

And just as there can be no doubt that the state legislation would constitute "a requirement for labeling," (citation omitted), so too does the conflicting common law duty fall within the scope of § 136v(b).

*Id.* at 1307. The court went on to hold that "the language of § 136v(b) manifestly ordains the preemption of the establishment or enforcement of any common law duty that would impose a labeling requirement inconsistent with those established by FIFRA, . . . or the EPA in its regulations." *Id.* at 1308. The court, however, took a narrow view of the preemption:

> If to avoid breaching a state duty a pesticide producer is required to revise its pesticide labeling, then the duty, common law or otherwise, is preempted by § 136v(b). *Yet if the state imposes a duty to improve a product or to maintain a label in accordance with the federal standards, no conflict exists and FIFRA does not preempt.*

*Id.* at 1309 (emphasis added). As the court believed that the district court had taken a broader view of FIFRA's preemptive effect, the court vacated the district court's decision and remanded for an individual reconsideration of each of Worm's claims. *Id.*

On remand, the district court found that all of Worm's claims were either preempted or were unsupported by the evidence. A second appeal followed. *Worm v. American Cyanamid,* 5 F.3d 744 (1993).

In *Worm II,* the court of appeals reexamined its holding in *Worm I* in light of the *Cipollone* decision, which had been released in the interim, and concluded that the Supreme Court's "restrictive analysis [in *Cipollone* ] would appear to require no change in the analysis of *Worm I.*" Nevertheless, the court seemed to expand its analysis in *Worm II* by stating:

> Given the comprehensive nature of the FIFRA labeling process, it is apparent that § 136v(b), prohibiting any state requirement in addition to or different from the federal requirements, dictates the preemp-

tion of any state common law cause of action that rests on an alleged failure to warn or communicate information about a product through its labeling.

*Id.* The court noted, however, that "[c]laims for negligent testing, manufacturing, and formulating, on the other hand, are not preempted." *Id.* While the court noted that the line between a labeling claim and a defective product claim is not always clear, the court posited that the issue could be resolved by a simple test: would the manufacturer seek to avoid liability by altering the label or the product? *Id.* The court concluded that the Worm claims clearly were based on an inadequacy of labeling theory, the court found that the claims were preempted and offered the following rationale:

> Because the language on the label was determined by the EPA to comply with federal standards, to argue that the warnings on the label are inadequate is to seek to hold the label to a standard different that the federal one. Nor does it make any difference that the standard Worm seeks to apply is one imposed by the common law rather than by positive legislation or executive enactment. Any distinction between the two is "illusory."

*Id.* In so concluding, the court rejected all of Worm's claims that a manufacturer could comply with common law duties through point-of-sale notices, other promotional materials, or voluntary disclosures. *Id.*

Two appellate courts have decided the FIFRA preemption issue since *Cipollone* was handed down. An opinion issued by the Court of Appeals for the Seventh Circuit, *Shaw v. Dow Brands,* 994 F.2d 364 (7th Cir.1993), has adopted the *Cipollone* rationale. The Court of Appeals for the First Circuit reached a similar result in *King v. E.I. Dupont de Nemours and Co.,* 996 F.2d 1346 (1st Cir.1993).

#### f. Seventh Circuit

Shaw was injured when he combined Dow Bathroom Cleaner with X–14 Instant Mildew Stain Remover while cleaning his bathroom. Shaw brought an action against Dow Brands claiming, *inter alia,* that the Dow Bathroom Cleaner label was inadequate and defective. The district court found that through FI-FRA, Congress had vested itself with complete regulatory control over labels and warnings on such products. and thus dismissed the state common law damages claim. *Shaw v. Dow Brands,* 994 F.2d 364 (7th Cir.1993).

Shaw maintained that Congress' exclusive jurisdiction in labeling and packaging still allowed for a common law tort action for defective labeling. The Fourth Circuit court found Shaw's argument to have some merit "because, unlike federal regulations which firms are required to follow, common law duties may be simply ignored by defendants." *Id.* at 370.

> Indeed, they are smart to do so if the cost of compensating victims is less that the cost of altering the behavior that gives rise to the suit. On the other hand, damages actions, just like regulatory mandates, causes companies to modify their economic decisions. It would be silly to pretend that federal lawmakers, seeking to occupy a whole field of regulation, wouldn't also be concerned about the distorting effects of tort actions.

*Id.*

In any event, the court found that the *Cipollone* decision answered the preemption question by holding that "sweeping congressional efforts to pre-empt state regulation also bar state damages claims." *Id.* at 370. The court concluded that to succeed, Shaw would be required to "show that FIFRA's preemption language is less sweeping than the language of the 1969 Cigarette Act." *Id.* at 371. The court found, however, that Shaw had not met this burden:

> ... We can discern no significant distinction at all—FIFRA says that "[s]uch State shall not impose * * * any requirement for labeling or packaging in addition to or different from those required * * *," while the cigarette law says "[n]o requirement[s] or prohibition[s] * * * imposed under State law" shall be permitted. Both seem equally emphatic: "[n]o requirements or prohibitions" is just another way of saying a "[s]tate shall not impose * * * any requirements." Not even the most dedicated hairsplitter could distinguish these state-

ments. If common law actions cannot survive under the 1969 cigarette law, then common law actions for labeling and packaging defects cannot survive under FIFRA.

*Id.* at 371. Thus, the court affirmed the district court's finding that Shaw's negligence claims for failure to warn were preempted by FIFRA. *Id.*

### g. First Circuit

A similar result analysis was employed by the First Circuit in *King v. E.I. Dupont de Nemours and Co.*, 996 F.2d 1346 (1st Cir. 1993). Former employees of the Maine Department of Transportation sued the manufacturer of chemical herbicides alleging that personal injuries resulted from repeated exposure to these chemicals. The sole basis for the claims made against Dupont was Dupont's alleged failure to provide adequate warnings on the herbicides. *Id.* at 1347. The district court, following the preemption standards applied by the Supreme Court in *Cipollone* found that FIFRA preempted the common law claims based upon failure to warn. *Id.*

Like the *Shaw* court, the First Circuit panel found that the "FIFRA language prohibiting the states from 'impos[ing] or continu[ing] in effect any requirements,' 7 U.S.C. § 136v(b), is virtually indistinguishable from the state-imposed 'requirement' language that *Cipollone* held preempted the state common law tort claims based on inadequate warnings." *Id.* at 1349. Thus, the court found that the language of FIFRA "preempts the state law lack-of-warning claims involved in this case." *Id.*

The court continued, however, stating that the "legislative history of the 1972 amendments to FIFRA ... [also] supports [this] conclusion." *Id.* at 1349–50. The court cited a Senate Committee Report stating that § 136v(b) "preempts any State or local government labeling or packaging requirements differing from such requirements under the Act." S.Rep. No. 92–970, 92d Cong., 2d Sess., (1972), *reprinted in* 1972 U.S.Code Cong. and Admin.News 3993, 4092, 4128. The court also quoted at length from a House Committee Report which stated "[i]n dividing

the responsibility between the States and Federal government for the management of an effective pesticide program, the Committee has adopted language which is intended to completely preempt State authority in regard to labeling and packaging." *Id.* at 1350, citing H.R.Rep. No. 92–511, 92d Cong., 2d Sess. 16 (1971), reprinted in 1972 U.S.Code Cong. & Admin.News 3993. The court affirmed the lower court decision, noting that the result was in accord with opinions issued by three sister circuits having decided the same issue. *See Papas v. Upjohn Co., supra; Arkansas Platte & Gulf Partnership v. Van Waters & Rogers, Inc., supra;* and *Shaw v. Dow Brands, supra.*

### h. Eighth Circuit

The Court of Appeals for the Eighth Circuit has not yet answered the FIFRA preemption issue. However, two decisions handed down in the wake of *Cipollone* are helpful in predicting the manner in which the appellate court might approach the FIFRA preemption issue. The most recent is *Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354 (8th Cir.1993), decided on July 19, 1993.

In *Kinley*, the issue before the court was whether an Iowa state statute regulating the transportation of hazardous liquids by pipeline was preempted by the federal Hazardous Liquid Pipeline Safety Act. The district court held, *inter alia*, that the statute expressly was preempted by the Act and the utility appealed. *Id.* at 356.

The Act contained the following language: "No state agency may adopt or continue in force any safety standards applicable to interstate pipeline facilities or the transportation of hazardous liquids associated with such facilities." *Id.* at 358, citing 49 U.S.C. § 2002(d). Examining this language, the court stated that "[i]n the present case, we need look no further than the *express statutory language* ... as Congress has *expressly* stated its intent to preempt the states from regulating in the area of safety in connection with interstate hazardous liquid pipelines." *Id.* at 358 (emphasis added). The court's approach rested upon the following Supreme Court analysis in *Cipollone:*

When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation.

*Id.*, quoting *Cipollone*, —— U.S. ——, ——, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992). Thus, the court found that Chapter 479, the state statute establishing a comprehensive state program supervising pipeline transportation of liquid substances in an effort to protect the safety and welfare of the public, was preempted by the Act and affirmed the judgment of the district court. *Id.* at 358.

*Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993), decided June 17, 1993, is also a post-*Cipollone* decision. In *Weber*, the issue before the court was whether the Minnesota Congressional Campaign Reform Act is preempted by the Federal Election Campaign Act (FECA). In 1990, in an effort to supplement the federal act limiting political contributions and campaign expenditures, the Minnesota legislature established a system by which federal congressional candidates may agree to limit campaign expenditures and receive state funding for their campaigns. *Id.* at 873–875. The Minnesota Act was challenged under the preemption doctrine.

The court noted that FECA contained an express preemption: "The provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." *Id.* at 875, quoting 2 U.S.C. § 453. In addition, the court recognized that Congress had vested the FEC with "primary and substantial responsibility for administering and enforcing the Act," delegated the FEC "extensive rulemaking and adjudicative powers," and authorized the FEC to prescribe rules and regulations and provide advisory opinions when requested. *Id.*

The court started with the premise that "Congress' intent is the touchstone of our analysis of whether FECA preempts" the Minnesota Act. Then stating that "the preemptive scope of the federal law," under the standard set forth in *Cipollone*, "is governed entirely by the express language," the court found that Congress had stated its intent to preempt state law by speaking expressly on this issue. *Id.* The court, therefore, characterized its only role as "identify[ing] the domain expressly preempted...." *Id.* Recognizing the strong presumption against preemption and narrowly construing the language of the federal act, the court found that "under every plausible reading" of FECA, the Minnesota Act falls within the preempted domain. *Id.*

### i. Arkansas

Although handed down prior to *Cipollone*, the only reported Arkansas district court decision also found that FIFRA preempted claims based on inadequate labeling and failure to warn. In *Young v. American Cyanamid Co.*, 786 F.Supp. 781 (E.D.Ark.1991), Judge Woods viewed the Supreme Court's decision in *Mortier* as answering the question of whether tort claims based on inadequate labeling and packaging are preempted by FIFRA. As Judge Woods noted, in *Mortier*, the Supreme Court contrasted § 136v(a) with § 136v(b), supplying the following analysis with respect to preemption of state regulation:

> More importantly, field pre-emption cannot be inferred. In the first place, § 136v itself undercuts such an inference. The provision immediately following the statute's grant of regulatory authority to the States declares that "[s]uch State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under" FIFRA. 7 U.S.C. § 136v(a). This language would be pure surplusage if Congress had intended to occupy the entire field of pesticide regulation.

*Id.* at 783. The court concluded from this Supreme Court passage that Congress did not intend to preempt the entire field of pesticide regulation but only those areas specifically mentioned—labeling and packaging. Id. at 783. Thus, the court found that "plaintiffs' common law tort claims based on inadequate labeling are preempted by FIFRA.

Additionally, the court pointed to dicta in *Mortier* which indicated that labeling is implicitly preempted, noting that "the legislative history of FIFRA and the reasoning of *Papas* dictate a similar result of [implied] preemption. *Id.*, citing *Mortier, supra.*

### 7. Analysis

It is apparent from examination of the emerging FIFRA preemption jurisprudence that the lower courts are divergent in the analyses employed and the results reached on FIFRA preemption issue. It is also apparent that *Cipollone* has not simplified or clarified but rather complicated preemption law. Justice Blackmun was highly accurate when predicting that courts would encounter difficulty "in attempting to implement *Cipollone.*" *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2631. And as Justice Scalia noted, it is also apparent that questions raised by *Cipollone* "will fill the law-books for years to come." *Id.* —— U.S. at ——, 112 S.Ct. at 2638.

■ The plurality in *Cipollone* indicated that when Congress has spoken, the question is not *whether* Congress intended to preempt state regulation but to *what extent,* providing that courts should resort to principles of implied preemption only when Congress has been silent with respect to preemption. *Id.* —— U.S. at —— - ——, 112 S.Ct. at 2625–26. The plurality then arguably proceeded to look beyond the express language of the 1969 Cigarette Act when analyzing each of Cippolone's common law claims under the Act's preemption provisions. While the plurality opinion was criticized by other members on the court and has been criticized by lower courts, the court nevertheless believes that the Court of Appeals for the Eighth Circuit has endorsed Justice Stevens' narrow preemption analysis. The court reads the *Kinley* and *Weber* decisions as setting forth the framework of preemption analysis to be applied in this circuit when Congress has included preemption provisions within its legislation. The court finds, therefore, that since Congress clearly has included within FIFRA a provision explicitly addressing the issue of preemption, the sole role of this court is "to

identify the domain expressly preempted" by § 136v(b).

As an interpreting court must "begin with the language employed by Congress and the assumption that the ordinary meaning of the language accurately expresses the legislative purpose," *FMC Corp. v. Holliday*, 498 U.S. 52, 57, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990), the court will begin with the language of FIFRA. As the court and counsel are now familiar, § 136v(b) prohibits states from "impos[ing] or continu[ing] in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b). Thus, to succeed under the *Cipollone* express preemption standard, the DerGarzarians must show that FIFRA's preemption language is less sweeping than the preemption language of the 1969 Cigarette Act. Otherwise, plaintiffs' claims that Dursban 2E's labels were inadequate or failed to warn of the dangerous propensities of Dursban 2E are preempted.

Although at least one district court has determined that the preemptive language included in § 136v(b) of FIFRA is "indistinguishable" from the language of the 1965 Cigarette Act found not to preempt common law tort claims, *see Couture*, 804 F.Supp. at 1302, this court adopts the reasoning of the First and Seventh Circuits which both found more similarities between FIFRA and the 1969 Cigarette Act, one going so far as to find the preemption sections of FIFRA and the 1969 Act "virtually indistinguishable."

■ The court finds that § 136v(b), while not as broad as the preemption provision of the 1969 Act, is arguably not as narrow as the preemptive language of the 1965 Act. The 1965 Act simply barred "statements" relating to health and smoking while the 1969 Act bars "requirements and prohibitions imposed under state law." Section 136v(b) more closely resembles, in this court's opinion, the 1969 Act. Looking to the plain language of § 136v(b), state imposed "requirements" which are "in addition to or different from those required" under federal law clearly are prohibited. Certainly this is just another avenue of saying "no requirements . . . imposed under state law" shall be

permitted as the 1969 Cigarette Act provided. And as the Supreme Court has found that common law actions for inadequate labeling of cigarettes cannot survive under the latter language, then this court must conclude that common law actions for inadequate labeling of insecticides cannot survive under the former.

Additionally, *Cipollone* foreclosed any argument that the term "requirements" in this context does not include common law tort actions: "The phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2620.

Thus, the court believes that the language of § 136v(b) expressly preempts plaintiffs' failure to warn of the dangers in the use of Dursban 2E and failure to properly label the insecticide and the motion for partial summary judgment is granted on these two claims. The court specifically finds, however, that the remainder of plaintiffs' claims are not preempted, including plaintiffs' claim that defendant failed to use ordinary care in the formulation, inspection and testing of Dursban 2E and the motion is denied as to this claim. *See Cipollone,* —— U.S. at ——-——, 112 S.Ct. at 2621–22.

## ORDER

On this 22nd day of October, 1993, comes now before the court for consideration defendant Dow Chemical Company's motion for partial summary judgment. For the reasons set in a memorandum opinion of even date, the court finds that the motion for partial summary judgment should be and hereby is granted in part and denied in part.

IT IS SO ORDERED.